

DA 12-0050

IN THE SUPREME COURT OF THE STATE OF MONTANA

2012 MT 242

SHEILA CHIPMAN, DEBORAH WALLEN,
and ELLEN HAMES, individually and on
behalf of all others similarly situated,

        Plaintiffs and Appellees,

    v.

NORTHWEST HEALTHCARE CORPORATION,
and KALISPELL REGIONAL MEDICAL
CENTER, et al.,

        Defendants and Appellants.

APPEAL FROM:    District Court of the Eleventh Judicial District,
                In and For the County of Flathead, Cause No.  DV-08-976B
                Honorable Katherine R. Curtis, Presiding Judge

COUNSEL OF RECORD:

        For Appellants:

                Robert C.  Lukes (argued), Charles E.  Hansberry, Garlington, Lohn
                & Robinson, PLLP, Missoula, Montana

                Richard M.  Kobdish, Attorney at Law, Addison, Texas

        For Appellees:

                Amy Eddy (argued), David Sandler, Bottomly Eddy & Sandler Trial
                Attorneys, PLLP, Kalispell, Montana

                Argued and Submitted:  August 29, 2012

                          Decided:   October 30, 2012

Filed:

                        _____
                              Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 Plaintiffs Sheila Chipman (Chipman), Deborah Wallen (Wallen), and Ellen Hames (Hames) are employees of Defendant Kalispell Regional Medical Center, Inc. (KRMC) in Kalispell, Montana. Defendant Northwest Healthcare Corporation (NWHC) is the parent corporation of the remaining defendant entities. This case arises out of a dispute over the discontinuation of a sick leave buy-back program. Defendants appeal the order of the Eleventh Judicial District Court, Flathead County, granting Plaintiffs' motion for class certification. We affirm.

## ISSUES

¶2 We review the following two issues on appeal:

¶3 Whether the District Court properly determined that Plaintiffs have standing because the juridically linked defendants were operating under a common scheme; and

¶4 Whether the District Court abused its discretion in certifying the class under Rule 23(a) and (b) of the Montana Rules of Civil Procedure.

## FACTUAL AND PROCEDURAL BACKGROUND

¶5 The Appellants/Defendants are affiliated corporate entities (collectively Employers) who own and administer a hospital and other healthcare-related businesses in northwest Montana. NWHC is the umbrella parent corporation that exercises direct or indirect control over the other subsidiary defendant entities. KRMC, Brendan House, and The Summit are all nonprofit wholly owned subsidiaries of NWHC. The remaining Defendants, Applied Health Services, Inc. (AHS) and Northwest Orthopedic & Sports Medicine (NOSM), are for-profit wholly owned subsidiaries.

2

¶6    Some years ago, Employers implemented a benefit buy-back program that allowed eligible employees to accrue unused paid leave time designed to accommodate long-term illnesses, personal injury, or approved Family and Medical Leave Act time. This leave time could be accumulated in a continued illness bank (CIB). Permanent full-time and part-time employees (Employees) were eligible for the program after completing six months of employment. Employees who had worked twenty-five years or more for one of the Employers could cash out any CIB hours which remained in their "bank" upon retirement or severance. Employees could accrue up to 866 CIB hours. The CIB hours would be purchased back by Employers at the Employees' rate of pay at the time of retirement or severance.

¶7    Employers instituted the new policy at different times. NWHC, KRMC, and AHS implemented the plan on March 31, 2002. NOSM adopted the CIB program on November 11, 2005. The Summit adopted the policy on March 25, 2007. The record does not include the date upon which Brendan House implemented the CIB buy-back program.

¶8    The CIB buy-back policy was adopted as part of a compensation adjustment program aimed at recruiting and retaining Employees. Additionally, vacation and sick leave benefits were used to encourage Employees to remain in permanent status positions because PRN (as needed) or seasonal employees earned higher rates of pay. The CIB buy-back policy was also used as a way to partially compensate Employees when they were required to take low patient census days off from their regular work schedule. It was the hope of management that the benefit package would decrease the likelihood of

3

workforce unionization. Evidence shows that during the tenure of the CIB buy-back program, the retention of Employees increased over 100 percent. Notably, the amount of sick leave accrued by Employees increased by more than 300 percent while the program was in effect.

¶9 All employees of Employers, other than the CEO and approximately forty physicians, were initially employed pursuant to a standardized written probationary contract of employment. Employers maintained written employee policies and procedures which were contained in a handbook made available to Employees. According to Pat Wilson, NWHC Vice President of Human Resources, while the handbook summarized information for Employees and explained certain policies, the NWHC Official Policies and Procedures Manual was the overriding and controlling document. Employers created the manual to assure and maintain the consistency and accountability of corporate actions.

¶10 In 2008, KRMC met with new external auditors who informed KRMC that it must begin to account for the future payouts of the CIB program on its books, or the auditors could not issue an unqualified audit opinion. On July 1, 2008, KRMC eliminated the CIB buy-back program, citing concerns that accruing that liability on the books would jeopardize its ability to expand its operations and possibly endanger its credit rating for tax-exempt bond issuances. Only those Employees who had already reached twenty-five years of employment by July 2008 were still allowed to take advantage of the CIB buy-back program. When the program was discontinued, 1,254 employees were eligible to participate. As of January 31, 2011, that number had grown to over 1,500.

4

¶11     On September 2, 2008, three employees of KRMC initiated this action by filing a complaint in the Eleventh Judicial District Court, Flathead County.  The three named Plaintiffs—Chipman, Hames, and Wallen—alleged that Employers' termination of the CIB buy-back program constituted an unlawful breach of contract and a violation of the Montana Wage Protection Act.[1]  The complaint sought an order from the District Court certifying the lawsuit as a class action.  Plaintiffs defined class members as "All current employees of the Defendants hired prior to June 30, 2008, who were eligible to accrue hours into the employee's Continued Illness Bank."  The complaint also requested an order directing defendants to provide class members with notice of the lawsuit.

¶12     At the time the lawsuit was filed, none of the named Plaintiffs had worked at KRMC for twenty-five years.   Both Chipman and Hames have now reached the twenty-five-year mark.  Chipman began working at KRMC as a registered nurse on July 28, 1986.  Hames' employment as a registered nurse began on July 27, 1987.  Wallen is a respiratory therapist who started working at KRMC on June 15, 1988.

¶13     The District Court granted Plaintiffs' motion for class certification on January 12, 2012.  It defined the class as "[T]hose "status" employees of Northwest Healthcare, Applied Health Services, Inc., Brendan House, Kalispell Regional Medical Center, Inc., The Summit and Northwest Orthopedic & Sports Medicine, L.L.C., who were employed on or before June 30, 2008, when the sick leave policy was terminated."  The District Court dismissed all defendants not listed in its class definition.  The District Court's order

---

[1] Title 39, chapter 3, MCA.

also directed Plaintiffs to prepare a notice to class members which would be distributed by Defendants to Employees in payroll stuffers.

¶14　Employers filed a Motion to Stay Proceedings Pending Appeal on January 24, 2012.　On February 13, 2012, the District Court stayed all proceedings related to class certification, including issuing notice to the class.　However, the District Court retained jurisdiction to address the merits of Plaintiffs' underlying substantive claims.　On April 26, 2012, Plaintiffs filed a Motion for Partial Summary Judgment concerning three issues:　(1) whether the employment relationship is governed by a standardized group contract, the terms of which are defined by the official policies and procedures manual; (2) whether the CIB benefit is deferred compensation that contractually vested, and as such cannot be unilaterally terminated by the Defendants; and (3) whether the CIB benefit constitutes "wages" for purposes of the Montana Wage Act.　These issues have been briefed before the District Court but no decision has been made.

¶15　Employers challenge the District Court's January 12, 2012 order certifying the class.　Employers also challenge Plaintiffs' standing.　These issues were heard on oral argument before this Court on August 29, 2012.

## STANDARDS OF REVIEW

¶16　Issues of justiciability—such as standing, mootness, ripeness, and political question—are questions of law, for which our review is de novo. *Reichert v. State,* 2012 MT 111, ¶ 20, 365 Mont. 92, 278 P.3d 455.　A district court's determination regarding standing presents a question of law which we review de novo for correctness. *Mont.*

6

*State Fund v. Simms*, 2012 MT 22, ¶ 14, 364 Mont. 14, 270 P.3d 64; *Heffernan v. Missoula City Council*, 2011 MT 91, ¶ 28, 360 Mont. 207, 255 P.3d 80.

¶17 We review a district court's decision on a motion for class certification for an abuse of discretion. *LaMere v. Farmers Ins. Exch.*, 2011 MT 272, ¶ 14, 362 Mont. 379, 265 P.3d 617; *Hop v. Safeco Ins. Co.*, 2011 MT 215, ¶ 9, 361 Mont. 510, 261 P.3d 981. The abuse of discretion question "is not whether this Court would have reached the same decision, but, whether the district court acted arbitrarily without conscientious judgment or exceeded the bounds of reason." *Newman v. Lichfield*, 2012 MT 47, ¶ 22, 364 Mont. 243, 272 P.3d 625. In class certification cases, the district court's judgment should be accorded the greatest respect because it is in the best position to consider the most fair and efficient procedure for conducting any given litigation. *Diaz v. Blue Cross & Blue Shield*, 2011 MT 322, ¶ 10, 363 Mont. 151, 267 P.3d 756; *Sieglock v. Burlington Northern & Santa Fe Ry. Co.*, 2003 MT 355, ¶ 8, 319 Mont. 8, 81 P.3d 495.

## DISCUSSION

¶18 *Issue 1: Did the District Court properly determine that the named Plaintiffs have standing to bring claims against Defendants they did not directly work for based on a juridical link between Defendants?*

**A. Justiciability**

¶19 The judicial power of Montana's courts is limited to justiciable controversies. *Reichert*, ¶ 53; *Greater Missoula Area Fedn. of Early Childhood Educators v. Child Start, Inc.*, 2009 MT 362, ¶ 22, 353 Mont. 201, 219 P.3d 881. The parties must present a justiciable controversy before a court can consider the merits of an issue. *Dennis v. Brown*, 2005 MT 85, ¶ 8, 326 Mont. 422, 110 P.3d 17. A justiciable controversy is a

threshold requirement for a court to grant relief. *Powder River County v. State*, 2002 MT 259, ¶ 101, 312 Mont. 198, 60 P.3d 357.   In determining whether a justiciable controversy exists, this Court engages in a three-part analysis:

> First, a justiciable controversy requires that parties have existing and genuine, as distinguished from theoretical, rights or interests.  Second, the controversy must be one upon which the judgment of the court may effectively operate, as distinguished from a debate or argument invoking a purely political, administrative, philosophical or academic conclusion.  Third, [it] must be a controversy the judicial determination of which will have the effect of a final judgment in law or decree in equity upon the rights, status or legal relationships of one or more of the real parties in interest, or lacking these qualities be of such overriding public moment as to constitute the legal equivalent of all of them.

*Powder River*, ¶ 102; *Northfield Ins. Co. v. Mont. Ass'n of Counties*, 2000 MT 256, ¶ 12, 301 Mont. 472, 10 P.3d 813.

¶20    The District Court applied the *Powder River* three-part test and determined that the lawsuit presented a justiciable controversy.  On the first element, Employees contended that they have an enforceable, standardized group employment contract that includes the CIB benefit, and that the contract became effective when a person became a status employee, even though actual payment would not occur until the employee retired.  Employers countered that Employees' interest in the CIB benefits was purely theoretical.  Specifically, they argued that Employees are not entitled to a speculative determination regarding their right to a future payment because it is uncertain that an employee will reach the twenty-five year mark or will have remaining hours in their CIB bank at the time of separation or retirement.  The District Court concluded that Employees had successfully demonstrated an existing, real, and genuine controversy.

¶21 We agree with the District Court that Employees have satisfied the first element of the *Powder River* analysis. There are at least three real and genuine controversies: (1) Whether the employment relationship between the parties is governed by an enforceable, standardized group employment contract, the terms of which are defined by the official policies and procedures manual—including the CIB benefit; (2) Whether the CIB benefit is deferred compensation that contractually vested at the time the policy was adopted, communicated, and consideration was provided, and as such cannot be unilaterally terminated by Employers; and (3) Whether the CIB benefits constitute "wages" for purposes of the Montana Wage Act. These controversies are based on an existing employment relationship and relate to the nature of benefits that have already been accrued. Plaintiffs are not merely seeking recovery of lost future benefits, but are instead requesting a determination on the nature and value of their interests and rights in CIB hours that they have already banked and will continue to accrue. Even without reaching the merits of the three controversies noted by the District Court, it is apparent that these issues are real, genuine, and currently exist.

¶22 On the second element of the *Powder River* test, the District Court determined that a judgment on whether an enforceable employment agreement exists would have real impact on the parties' rights, status, or legal relationships. Regardless of how the District Court rules on these controversies, its decision will effectively operate to settle the issues at hand. There is no indication that a judgment would be purely political, administrative, philosophical or academic. The District Court correctly concluded that the second prong of the justiciability analysis was satisfied.

¶23    The third and final aspect of the *Powder River* test requires a controversy for which a judicial determination will have the effect of a final judgment in law or decree in equity upon the rights, status or legal relationships of one or more of the real parties in interest.  As previously discussed in relation to the second prong of the analysis, the main thrust of the lawsuit is for the Court to determine the contractual relationships of the parties.  The controversy directly involves the rights, status, and legal relationships of the parties.  We agree with the District Court that Employees have established the third element.  We affirm the District Court's conclusion that Employees have met all three prongs of the *Powder River* justiciability test.

**B.  Standing**

¶24    We turn next to the issue of standing.  Employers raise two standing arguments.  First, Employers argue that Employees do not have standing because they have suffered no injury in fact.  Second, Employers challenge the named Plaintiffs' standing to sue the non-KRMC Employers.

¶25    "The central concepts of justiciability have been elaborated into more specific categories or doctrines—namely, advisory opinions, feigned and collusive cases, standing, ripeness, mootness, political questions, and administrative questions—each of which is governed by its own set of substantive rules." *Greater Missoula*, ¶ 23.  Standing is the doctrine at issue in the present case.  The question of standing addresses whether a litigant is entitled to have the court decide the merits of a particular dispute.  *Williamson v. Mont. PSC*, 2012 MT 32, ¶ 28, 364 Mont. 128, 272 P.3d 71; *Heffernan*, ¶ 30.  Standing resolves the issue of whether the litigant is a proper party to seek adjudication of a

10

particular issue, not whether the issue is justiciable. *Mont. Trout Unlimited v. Beaverhead Water Co.*, 2011 MT 151, ¶ 27, 361 Mont. 77, 255 P.3d 179; *Helena Parents Comm'n v. Lewis & Clark County Comm'rs*, 277 Mont. 367, 371, 922 P.2d 1140, 1142 (1996). Standing is determined as of the time the action is brought. *Heffernan*, ¶ 30. "Standing is a jurisdictional element that must be satisfied prior to class certification." *Lee v. State of Oregon*, 107 F.3d 1382, 1390 (9th Cir. 1997).

¶26 Under Montana law, the complaining party must clearly allege past, present or threatened injury to a property or civil right, and the alleged injury must be one that would be alleviated by successfully maintaining the action. *Williamson*, ¶ 28; *Heffernan*, ¶ 33. This Court has adopted prudential rules under which a litigant may assert only her own rights, and the alleged injury must be distinguishable from the injury to the public generally, though not necessarily exclusive to the plaintiff. *Williamson*, ¶ 28; *Heffernan*, ¶ 33. Adopted essentially as matters of judicial self-governance, these prudential rules are subject to exceptions. *Williamson*, ¶ 28; *Heffernan*, ¶ 32.

¶27 In analyzing standing, it is helpful to understand its relationship to ripeness. While standing may rest on past or present injury, it is important to note that standing may also rest on a *threatened* injury. *Reichert*, ¶ 55; *Gryczan v. State*, 283 Mont. 433, 442, 942 P.2d 112, 118 (1997); *Missoula City-County Air Pollution Control Bd. v. Board of Envtl. Review*, 282 Mont. 255, 262, 937 P.2d 463, 468 (1997). "Ripeness asks whether an injury that has not yet happened is sufficiently likely to happen or, instead, is too contingent or remote to support present adjudication." *Reichert*, ¶ 55. In this way, ripeness can be viewed as the time dimension of standing. *Reichert*, ¶ 55.

11

¶28 In challenging standing, Employers point to the fact that at the time of filing the complaint, none of the three named Plaintiffs had completed twenty-five years of employment. Employers argue that it is impossible to determine which Employees, if any, will reach the twenty-five year requirement and carry a balance of CIB hours at retirement. Since eligibility and entitlement to the benefit hinge on hypothetical contingencies and unknown future events, Employers contend that Employees have suffered no injury in fact. Employees counter that the CIB benefit vested when the policy was instituted and Employees continued to perform work for Employers. Employees argue that reaching the requisite twenty-five years of employment only affects the time of performance and determines the amount of the buyout, in contrast to the Employers' theory that twenty-five years of employment is a condition precedent for the vesting of the CIB benefit.

¶29 Employers rely on two decisions from federal circuit courts in support of their position that Plaintiffs have suffered no injury in fact. *See Bova v. City of Medford*, 564 F.3d 1093 (9th Cir. 2009); *Auerbach v. Board of Educ.*, 136 F.3d 104 (2d Cir. 1998). In *Bova*, city employees appealed Medford's decision to discontinue health insurance coverage to city employees after they retired. 564 F.3d at 1094. The city employees based their claims on an Oregon statute that required local governments "insofar as and to the extent possible" to make health insurance available to their retired employees who elected to receive coverage. *Bova*, 564 F.3d at 1094-95. The two named plaintiffs challenging the city's actions were eligible for retirement at the time of filing their claims, but neither had retired and been denied coverage. *Bova*, 564 F.3d at 1095. The

court applied a mixed standing/ripeness analysis and dismissed the city employees' case as unripe. *Bova*, 564 F.3d at 1097. The court reasoned that the alleged injury was contingent on each plaintiff's future retirement and the city's future denial of benefits—neither of which had occurred. *Bova*, 564 F.3d at 1096. The plaintiffs could change jobs, be terminated, or die before retirement, and the city could change its mind and adopt a different policy that extended coverage. *Bova*, 564 F.3d at 1096-97. Given these future contingencies, the court held that neither plaintiff suffered an injury that was "concrete and particularized" enough to survive the standing/ripeness inquiry. *Bova*, 564 F.3d at 1097.

¶30 In *Auerbach*, fourteen present and former public school teachers alleged that the school district's early retirement incentive plan violated federal laws prohibiting age discrimination in employment. *Auerbach*, 136 F.3d at 107. The court held that the injury alleged by the teachers still employed by the school district was entirely speculative because these teachers had not yet retired, and therefore, had not been denied any incentives paid to their younger colleagues. *Auerbach*, 136 F.3d at 109. The court also relied on the fact that a new collective bargaining agreement was being negotiated during the pendency of the appeal, so the disputed contractual terms might be different when the teachers actually retired. *Auerbach*, 136 F.3d at 109. The court determined that the ripeness doctrine prevented the adjudication of an issue that may never arise. *Auerbach*, 136 F.3d at 109.

¶31 Employers' reliance on these cases is misplaced. Both cases are distinguishable in important ways. *Bova* involved a post-retirement benefit that did not accrue over time.

Here, Employees earned the hours in the CIB bank over several years while the policy was in place. Sick leave benefits constituted a portion of their compensation for which they had a present right of use. In *Auerbach*, the contested policy change involved an optional incentive plan that did not require the participation of any of the teachers. Furthermore, the future of the policy change was uncertain because union negotiations continued while the case was being argued. In the case before us, Employers' discontinuation of the CIB buy-back program was a mandatory and final change.

¶32    Employees brought this action in part under Montana's Uniform Declaratory Judgments Act (UDJA).[2]    Employees requested in their amended complaint "[a] judgment or order declaring the Plaintiffs to have a contractual and/or wage right to the CIB benefits if they work for Defendants for 25 cumulative years or more." Employees seek remedies that are primarily declaratory and injunctive. The purpose of the UDJA "is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations; and it is to be liberally construed and administered." Section 27-8-102, MCA. As cited by the District Court, the courts "shall have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed." Section 27-8-201, MCA. Section 27-8-202, MCA, provides:

> **Who may obtain declaratory judgment.** Any person interested under a deed, will, written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder.

---

[2] Title 27, chapter 8, MCA.

Additionally, § 27-8-203, MCA, allows a contract to "be construed either before or after there has been a breach thereof."

¶33 This Court has previously interpreted the UDJA as granting Montana courts the power to issue declaratory judgments when an employee suffers a threatened injury. *McKamey v. State*, 268 Mont. 137, 885 P.2d 515 (1994) (overruled on other grounds by *Trs. of Ind. Univ. v. Buxbaum*, 2003 MT 97, 315 Mont. 210, 69 P.3d 663). In *McKamey*, a firefighter who worked for the state of Montana filed an action seeking declaratory, injunctive, and equitable relief from the State's requirement that the firefighter must be a member of the Montana Air National Guard as a condition of employment. *McKamey*, 268 Mont. at 141, 885 P.2d at 518. The firefighter wanted to retire from the Montana Air National Guard and remain employed by the State. The State argued that a declaratory judgment would constitute an improper advisory opinion based on a possible future occurrence because the firefighter had not yet retired or resigned from the Montana Air National Guard. *McKamey*, 268 Mont. at 141, 885 P.2d at 518. The firefighter felt his right to retire from the Montana Air National Guard was threatened, and that if the State fired him his family would have no income, insurance, or other benefits and his pension would be reduced. *McKamey*, 268 Mont. at 142, 885 P.2d at 519. The Court held that the firefighter met the requirement of alleging a threatened injury and the case was therefore justiciable. *McKamey*, 268 Mont. at 142, 885 P.2d at 519.

¶34 Other decisions from this Court similarly support a plaintiff's standing to sue when faced with a threatened injury. In *Gryczan*, six homosexual Montanans brought a

15

declaratory judgment action against the State seeking a determination as to whether a criminal statute proscribing deviate sexual conduct was unconstitutional. The State challenged the standing of the petitioners on the grounds that they had suffered no "injury in fact" because they had never been arrested or prosecuted for violating the statute and there was no evidence of a credible threat of prosecution. *Gryczan*, 283 Mont. at 441, 942 P.2d at 117. The Court determined that the petitioners suffered legitimate and realistic fears of prosecution along with other psychological harms. *Gryczan*, 283 Mont. at 446, 942 P.2d at 120. The Court held that petitioners had standing to challenge the statute, and it was not necessary to wait until one of them was prosecuted before an action could be maintained. *Gryczan*, 283 Mont. at 446, 942 P.2d at 120.

¶35 Here, Employees are statutorily entitled to obtain a declaration regarding their rights, status, and employment relationship under the Employers' manual and handbook. Employees alleged that the CIB buy-back program was part of their employment contract. The discontinuation of the CIB buy-back program threatens the nature of the Employees' benefits and the rights of Employees to be compensated for the hours in their CIB banks at the time of retirement. As in *McKamey*, we will not require an employee to retire before knowing what effect his retirement will have on his right to receive certain benefits. Under Employers' theory of standing and ripeness in this case, Employees would be required to retire before challenging Employers' decision not to allow Employees to cash out their accumulated hours in their CIB banks. This would lead to incredible uncertainty for Employees.

16

¶36 Employees clearly changed their behavior in response to the CIB buy-back program. Tellingly, the retention of long-term Employees increased over 100 percent and the amount of sick leave accrued by Employees increased by more than 300 percent while the program was in effect. Without a declaration regarding Employees' rights to cash out their accrued hours, Employees are left to guess whether they should continue to accumulate hours for retirement or use them as they accrue. Allowing a court to declare the rights and status of the parties at this time will avoid the unnecessary hardships and uncertainty that would follow if Employees were required to wait until retirement to raise a challenge. Accordingly, we hold that Employees sufficiently alleged a threatened injury to a property right and therefore have standing to challenge the Employers' discontinuation of the CIB buy-back program.

## C. Standing to Sue the Non-KRMC Employers

¶37 Employers contend that even if this Court finds that general standing exists, we should dismiss the claims against all of the Employers except for KRMC based on lack of standing. Employers premise their argument on the fact that all of the named Plaintiffs work for KRMC and have no relationship or dealings with the remaining Employers. Employees argue that Employers are juridically linked and have injured all members of the class through a concerted scheme.

¶38 Generally, plaintiffs cannot bring a class action against defendants with whom they have had no dealings. *Murer v. Mont. State Comp. Mut. Ins. Fund*, 257 Mont. 434, 438, 849 P.2d 1036, 1038 (1993). In *Murer*, a group of nine individuals sought to certify a workers' compensation class for benefit claims against unknown insurers. *Murer*, 257

Mont. at 437, 849 P.2d at 1038. We affirmed the Workers' Compensation Court's decision to deny class certification because the individuals could only represent a class of which they are a member, in that instance meaning claimants who had claims against the same insurer as the representative. *Murer*, 257 Mont. at 437, 849 P.2d at 1038. The Court found no authority that would permit an unknown number of class members to blindly sue an unknown number of defendants, creating in effect a "class of defendants." *Murer*, 257 Mont. at 437, 849 P.2d at 1038. This is the general rule relied upon by Employers. However, *Murer* went on to adopt two exceptions to this general rule that are applicable to this case and would permit the class action: (1) if the injuries suffered were the result of a conspiracy or concerted scheme between the defendants; and (2) all defendants are juridically related in a manner that suggests a single resolution of the dispute will be expeditious. *Murer*, 257 Mont. at 438-39, 849 P.2d at 1039 (citing *La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461, 465 (9th Cir. 1973)).

¶39 The juridical link doctrine relied on in the *Murer* case arose in the Ninth Circuit's *La Mar* decision. In *La Mar*, an airline passenger sued the airline from which he purchased a ticket, alleging that the airline overcharged him under the tariff rules. *La Mar*, 489 F.2d at 463. The plaintiff also included six other airlines in his action and brought it on behalf of all others who had suffered a similar overcharge. *La Mar*, 489 F.2d at 463. The plaintiff did not purchase a ticket from these six other defendant airlines and had no dealings with them. *La Mar*, 489 F.2d at 463. The court held that generally, a plaintiff without a cause of action against a specific defendant cannot "fairly and adequately protect the interests" of those who do have such causes of action for purposes

18

of Rule 23(a). *La Mar*, 489 F.2d at 466. Nevertheless, the court went on to recognize the two exceptions subsequently adopted in *Murer* for instances involving a concerted scheme or a juridical relationship. *La Mar*, 489 F.2d at 466.

¶40 A "juridical relationship," often called a "juridical link," refers to a type of legal relationship which connects all defendants in a way that would make single resolution of a dispute preferable to a multiplicity of similar actions. *In re Itel Sec. Litigation,* 89 F.R.D. 104, 121 (N.D. Cal. 1981). The *Murer* decision noted that defining and articulating what constitutes a juridical relationship or link is a difficult task. *Murer*, 257 Mont. at 439, 849 P.2d at 1039. As an example of a fact-based juridical link, *Murer* pointed to a situation where all the various defendants are related instrumentalities of a single state. *Murer*, 257 Mont. at 439, 849 P.2d at 1039. Employers argue that this Court should only recognize the existence of a juridical relationship under those specific factual circumstances discussed in *Murer*. However, federal case law since *La Mar* supports a wider view of the doctrine, with courts applying the doctrine to circumstances in which "all the defendants took part in a similar scheme that was sustained either by a contract or conspiracy, or was mandated by a uniform state rule," such that it was "appropriate to join as defendants even parties with whom the *named* class representative did not have direct contact." *Payton v. County of Kane*, 308 F.3d 673, 679 (7th Cir. 2002) (emphasis in original); *Moore v. Comfed Sav. Bank*, 908 F.2d 834, 838-39 (11th Cir. 1990); *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 423-24 (6th Cir. 1998). Other jurisdictions have applied the juridical link doctrine to join individual corporations that shared common corporate ownership. *See Barker v. FSC Sec. Corp.*, 133 F.R.D. 548, 553-54

(W.D. Ark. 1989) (applying juridical link exception to join two corporations in a class action because both defendants were subsidiaries of the same parent corporation for four of the twelve years in which the alleged injury occurred); *TCI Cablevision of Dallas v. Owens*, 8 S.W.3d 837, 843 (Tex. App. 2000) (cable customer who received cable service from one defendant established a juridical link under common ownership theory and could represent class of cable customers who received cable service from other entities and affiliates owned by a common parent company).  Furthermore, many courts have applied the juridical link doctrine to allow a plaintiff to join additional defendants with identical obligations under a contract.  *See Weld v. Glaxo Wellcome, Inc.,* 746 N.E.2d 522, 530 (Mass. 2001) (holding that plaintiff claiming harm caused by a contract between a pharmacy and a drug manufacturer could represent a class of plaintiffs harmed by contracts that created identical obligations with manufacturers with whom the plaintiff had no relationship); *In re Activision Securities Litigation*, 621 F. Supp. 415, 432 (N.D. Cal. 1985) (finding a juridical link among underwriter defendants under a common agreement containing certain indemnity and expense sharing clauses).

¶41     All Employers are owned and controlled by a common parent corporation, NWHC.  Employers implemented an identical CIB buy-back program.  The discontinuation of the CIB buy-back program was a concerted scheme affecting Employees of each Defendant entity in the same way.  Employers utilized the same policies and procedures manual to maintain consistent corporate actions.  Even though the three named Plaintiffs were employed only by KRMC, the relationship among Employers makes single resolution of this dispute preferable to a multiplicity of similar

20

actions. We therefore hold that the injuries alleged by the class members were the result of a concerted scheme and a juridical link exists between Employers based on common ownership and identical employment terms. We conclude that Employees have standing to maintain their claims against the non-KRMC Employers.

¶42    *Issue 2: Did the District Court abuse its discretion in certifying the class under Rule 23(a) and (b) of the Montana Rules of Civil Procedure?*

**A. Rule 23(a)**

¶43    The propriety of a class action is governed by Rule 23 of the Montana Rules of Civil Procedure. Federal authority on the issue of class certification is instructive because the Montana version of Rule 23 is identical to the corresponding federal rule. *Sieglock*, ¶ 10. M. R. Civ. P. 23(a) sets forth four prerequisites necessary to sustain a class action:

**(1)** the class is so numerous that joinder of all members is impracticable;
**(2)** there are questions of law or fact common to the class;
**(3)** the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
**(4)** the representative parties will fairly and adequately protect the interests of the class.

The party seeking class certification bears the burden of establishing each element of Rule 23. *Diaz*, ¶ 27. Failure to establish each requisite element of Rule 23 is fatal to class certification. *Diaz*, ¶ 27; *Murer*, 257 Mont. at 437, 849 P.2d at 1037.

¶44    A district court should not assess any aspect of the merits unrelated to a Rule 23 requirement when deciding whether to certify a class. *Diaz*, ¶ 46; *Mattson v. Mont. Power Co.*, 2009 MT 286, ¶ 67, 352 Mont. 212, 215 P.3d 675. However, as the U.S. Supreme Court recognized in *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147,

21

160, 102 S. Ct. 2364, 2372 (1982), "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." "Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, ___ U.S. ___, ___, 131 S. Ct. 2541, 2551 (2011). Certification is proper only if the trial court is satisfied, after a "rigorous analysis," that all of the prerequisites of Rule 23(a) have been established. *Wal-Mart*, ___ U.S. at ___, 131 S. Ct. at 2551; *Falcon*, 457 U.S. at 161, 102 S. Ct. at 2372. Conducting a "rigorous analysis" will frequently entail some unavoidable overlap with the merits of plaintiffs' underlying claims. *Wal-Mart*, ___ U.S. at ___, 131 S. Ct. at 2551.

¶45 In evaluating the Rule 23(a) requirements, the District Court properly looked beyond the pleadings and did not consider the allegations in support of the class action as true on their face. *See Mattson*, ¶ 64. The District Court reviewed 116 employee declarations, various affidavits, and depositions from both parties before determining that the requirements of Rule 23 were met. We hold that the District Court did not abuse its discretion in certifying this lawsuit as a class action. Each relevant aspect of the Rule 23 inquiry is discussed in further detail below.

**1. Rule 23(a)(1)—Numerosity**

¶46 Employers do not dispute that the number of Employees governed by the CIB buy-back program meets the numerosity requirement. Rule 23(a)(1) requires that a proposed class "is so numerous that joinder of all members is impracticable." M. R. Civ. P. 23(a)(1). "[P]laintiffs must present some evidence of, or reasonably estimate, the number of class members." *Diaz*, ¶ 31 (quoting *Polich v. Burlington*

22

*Northern*, 116 F.R.D. 258, 261 (D. Mont. 1987)). When the CIB buy-back program was discontinued, 1,254 Employees were eligible to participate. We agree with the District Court that the large number of potential class members make joinder impracticable and that Employees have successfully satisfied the numerosity requirement.

## 2. Rule 23(a)(2)—Commonality

¶47 The commonality element requires "questions of law or fact common to the class." M. R. Civ. P. 23(a)(2). The U.S. Supreme Court's *Wal-Mart* decision significantly tightened the commonality requirement. Prior to *Wal-Mart*, Montana followed federal jurisprudence that imposed a relatively low burden on plaintiffs:

> The commonality requirement is not a stringent threshold and does not impose an unwieldy burden on plaintiffs. In fact, as a general rule, all that is necessary to satisfy Rule 23(a)(2) is an allegation of a standardized, uniform course of conduct by defendants affecting plaintiffs. Plaintiffs need only show a "common nucleus of operative facts" to satisfy Rule 23(a)(2).

*Ferguson v. Safeco Ins. Co. of Am.*, 2008 MT 109, ¶ 26, 342 Mont. 380, 180 P.3d 1164 (citing *LaBauve v. Olin Corp.*, 231 F.R.D. 632, 668 (S.D. Ala. 2005)). Rule 23(a)(2) was generally given a permissive application so that the commonality requirement was usually found to be satisfied. *McDonald v. Washington*, 261 Mont. 392, 401, 862 P.2d 1150, 1155 (1993). The commonality requirement was met when a single issue was common to all class members, regardless of differences among the class. *Diaz*, ¶ 32; *Ferguson*, ¶ 16.

¶48 *Wal-Mart* departed from this minimal standard that was often easily satisfied. In *Wal-Mart*, a class of 1.5 million current and former female employees alleged that the

company discriminated against them on the basis of their sex by denying them promotions and equal pay in violation of Title VII of the Civil Rights Act of 1964. ___ *Wal-Mart*, U.S. at ___, 131 S. Ct. at 2547. In addressing the commonality requirement, the *Wal-Mart* Court recognized that the language requiring "questions of law or fact common to the class" could easily be misread since any competently crafted complaint literally raises the requisite common questions. *Wal-Mart*, ___ U.S. at ___, 131 S. Ct. at 2550-51. To demonstrate that class members "have suffered the same injury," a plaintiff must show more than the fact that all class members were merely employed by the same company and that company violated the same provision of law. *Wal-Mart*, ___ U.S. at ___, 131 S. Ct. at 2551. Instead, the class members' claims must depend on a common contention that is capable of classwide resolution, "which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, ___ U.S. at ___, 131 S. Ct. at 2551. The Court further explained the commonality requirement as follows:

> What matters to class certification . . . is not the raising of common "questions"—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

*Wal-Mart*, ___ U.S. at ___, 131 S. Ct. at 2551 (emphasis in original) (citing Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)).

¶49 Applying this standard, the Court held that plaintiffs did not satisfy the commonality requirement because they provided no convincing proof of a company-wide

24

discriminatory pay and promotion policy. *Wal-Mart*, ___ U.S. at ___, 131 S. Ct. at 2556-57. The Court relied on *Falcon*, a decision that noted the conceptual gap between an individual's claim that he has been discriminated against and his otherwise unsupported allegation that the company has a policy of discrimination. *Wal-Mart*, ___ U.S. at ___, 131 S. Ct. at 2553. *Falcon* pointed to two different ways to bridge the conceptual gap: (1) if the employer used a biased testing procedure or biased company-wide evaluation method; or (2) significant proof that the employer operated under a general policy of discrimination. *Wal-Mart*, ___ U.S. at ___, 131 S. Ct. at 2553. The Court determined that Wal-Mart's policy of allowing local supervisors discretion over employment matters was just the opposite of the type of "uniform employment practice" that would provide commonality for a class action. *Wal-Mart*, ___ U.S. at ___, 131 S. Ct. at 2554. Finding that the class members "held a multitude of different jobs, at different levels of Wal-Mart's hierarchy, for variable lengths of time, in 3,400 stores, sprinkled across 50 states, with a kaleidoscope of supervisors (male and female), subject to a variety of regional policies that all differed," the Court concluded that the class members had "little in common but their sex and this lawsuit." *Wal-Mart*, ___ U.S. at ___, 131 S. Ct. at 2557.

¶50 The District Court determined that the class members in this case raised common questions of fact and law. Although a single common question will satisfy the commonality element, the District Court identified the following common questions: (1) whether or not there is an enforceable, standardized group employment contract between Employer and Employees; (2) whether or not the CIB benefit is part of the substantive

25

compensation under the contract; and (3) under what circumstances or at what point in time do the class members' contractual rights accrue. Employees argue that all three issues involve a standardized, uniform course of conduct by Employers that is sufficient to grant commonality.

¶51 Employers contend that proof of the essential elements of the questions raised by Employees inherently requires individual determinations. Specifically, Employers point to the different employment circumstances of each potential class member, differences in knowledge about the CIB buy-back program, and varying levels of involvement in meetings and discussions during implementation of the program. Employers argue that these differences necessitate fact-specific, individual inquiries into whether a contract was formed and what the terms of the employment relationship were between each employee and his employer.

¶52 Following this Court's long history of relying on federal jurisprudence when interpreting the class certification requirements of Rule 23, we apply the *Wal-Mart* reasoning to the present case. We agree with the District Court that the questions of fact and law raised by Employees are sufficient to satisfy the commonality requirement and support class certification. The existence of a standardized group contract is a common contention central to the validity of the claims of all class members that will drive the resolution of the litigation. The nature and enforceability of the CIB benefit similarly raises common questions of fact and law. Employers implemented the exact same CIB buy-back policy at the direction of the parent corporation, NWHC. The employee handbook and policy and procedures manual contained uniform language and was used

by all Employers to maintain consistent corporate actions. Unlike *Wal-Mart*, where individuals in the class were treated differently and local personnel had wide discretion, Employers operated under a company-wide policy that applies equally to all members of the class. Dissimilarities within the proposed class exist, but common facts connect all class members in relation to the ultimate resolution of this dispute. A court's determination of whether a standardized group contract exists and the legal obligations of the parties will generate common answers applicable to all class members. We conclude that Employees have successfully established commonality.

### 3. Rule 23(a)(3)—Typicality

¶53 To satisfy the typicality element, a plaintiff must demonstrate that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." M. R. Civ. P. 23(a)(3). The typicality requirement is designed to ensure that the interests of the named plaintiffs align with the interests of the class members, "the rationale being that a named plaintiff who vigorously pursues his or her own interests will necessarily advance the interests of the class." *Diaz*, ¶ 35; *McDonald*, 261 Mont. at 402, 862 P.2d at 1156. A named plaintiff's claim is typical if it "stems from the same *event, practice,* or *course of conduct* that forms the basis of the class claims and is based upon the same legal or remedial theory." *Diaz*, ¶ 35 (emphasis in original); *McDonald*, 261 Mont. at 402, 862 P.2d at 1156.

¶54 The District Court determined that the claims of the named Plaintiffs and the class members all arise from the same employment policy and the same manner of conduct in eliminating the CIB benefit. Employers argue that the named Plaintiffs' claims are

different from those of a large portion of the class because they have worked for Employers for a longer period of time than many class members, and the named Plaintiffs may or may not have attended a meeting with management regarding implementation of the CIB buy-back program. Employees counter that the dispute between the parties was triggered by Employers' course of conduct in unilaterally cancelling the CIB benefit. Furthermore, Employees argue that all class members are proceeding under the same legal theory involving the enforcement of a standardized group employment contract.

¶55 Employees bring to our attention the analogous case *Cates v. Cooper Tire & Rubber Co.*, 253 F.R.D. 422 (N.D. Ohio 2008). In *Cates*, the named plaintiffs were retirees seeking class certification for a lawsuit against their employer for imposing a cap on post-retirement health benefits. *Cates*, 253 F.R.D. at 424. Even though the benefit plans of the named plaintiffs varied slightly from those of other class members, the court determined that typicality was satisfied because all the claims arose from the employer's unilateral imposition of caps and all class members relied on the same legal theory that the benefits had vested. *Cates*, 253 F.R.D. at 429.

¶56 The claims of the named Plaintiffs and the class members all arise from Employers' discontinuation of the CIB buy-back program. This action was the type of "event, practice, or course of conduct" contemplated by Rule 23(a)(3) that establishes the necessary nexus between the injuries alleged by named Plaintiffs and class members. As was seen in *Cates*, Employers' discontinuation of the benefit forms the basis of all claims by both the named Plaintiffs and the members of the class. Additionally, the named Plaintiffs and the class members are all proceeding under the legal theory that a

28

standardized group employment contract was formed. Employees have satisfied the typicality requirement by establishing that the interests of the named Plaintiffs and the class members are sufficiently aligned.

### 4. Rule 23(a)(4)—Adequate Representation

¶57 Montana Rule of Civil Procedure 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Adequate representation requires that the named representative's attorney is qualified, competent, and able to conduct the litigation and the named representative's interests are not antagonistic to the class interests. *Diaz*, ¶ 38; *McDonald*, 261 Mont. at 403, 862 P.2d at 1156.

¶58 The District Court determined that the law firm of Bottomly, Eddy & Sandler, P.L.L.P. is qualified and competent counsel. The District Court also determined that Employers did not identify any conflicts between the interests of the named Plaintiffs and class members. On appeal, Employers reassert their standing and typicality arguments under this element. We addressed and resolved these issues in earlier sections of this Opinion. We conclude that counsel will adequately represent the class and no conflicts exist between the named Plaintiffs and class members.

### B. Rule 23(b)

¶59 Having determined that the Rule 23(a) prerequisites are satisfied, we now turn our inquiry to M. R. Civ. P. 23(b) The District Court determined that the proposed class met the requirements of Rule 23(b)(1) and (2). Employees did not seek class certification pursuant to Rule 23(b)(3).

### 1. Rule 23(b)(1)

¶60 A class action may be maintained under Rule 23(b)(1) if the Rule 23(a) prerequisites are satisfied and if:

(1) prosecuting separate actions by or against individual class members would create a risk of:
(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests[.]

M. R. Civ. P. 23(b)(1). Rule 23(b)(1) classes are designed to avoid prejudice to the defendant or absent class members that could result if individual actions were prosecuted in contrast to a class suit yielding a unitary adjudication. *Ferguson*, ¶ 30.

¶61 The District Court again relied on *Cates* in determining that class certification was appropriate. *Cates*, 253 F.R.D. at 431. In *Cates*, the court concluded that if it denied certification of the class, individual plaintiffs could file over 800 separate lawsuits, resulting in inconsistent judgments providing vested benefits to some retirees but not others. *Cates*, 253 F.R.D. at 431. Here, denying class certification could result in individual Plaintiffs bringing over 1,200 lawsuits. Not only could this potentially result in varying determinations of the same factual and legal issues, a decision could be dispositive for the absent class members by setting binding precedent. This would prejudice absent class members who raise the same issues but would be unable to participate in the lawsuit. Individual lawsuits would unnecessarily burden the courts and Employers, who would need to devote significant resources to addressing this wave of

30

litigation. Rule 23(b)(1) exists to avoid these exact problems. We conclude that the District Court did not abuse its discretion in certifying the class under Rule 23(b)(1).

¶62 Rule 23(b) provides three distinct routes to class certification. *Ferguson*, ¶ 30. Since we have determined that class certification is appropriate under Rule 23(b)(1), it is unnecessary to address the parties' arguments under Rule 23(b)(2).

## CONCLUSION

¶63 For the foregoing reasons, we affirm the District Court's order certifying this lawsuit as a class action and holding that Plaintiffs have standing to bring their claims.

/S/ PATRICIA COTTER

We concur:

/S/ MIKE McGRATH
/S/ JAMES C. NELSON
/S/ MICHAEL E WHEAT
/S/ BETH BAKER
/S/ BRIAN MORRIS
/S/ JIM RICE

31