JUSTICE RICE
delivered the Opinion of the Court.
¶1 Appellant Friends of the Wild Swan appeals from the order of the First Judicial District Court granting summary judgment in favor of Respondents Department of Natural Resources and Conservation and the Board of Land Commissioners. We affirm.
¶2 We restate the issue on appeal as follows:
¶3 Does § 77-1-202, MCA, require the Board of Land Commissioners to conduct a harvest-level financial accounting when considering a proposed timber sale on school trust lands?
BACKGROUND
¶4 In 2003, the Montana Department of Natural Resources and Conservation (DNRC) selected one of three alternatives set forth in a Final Environmental Impact Statement on logging in the Swan River State Forest. The selected alternative, “Alternative C,” proposed harvesting 10.2 million board feet in three phases from a parcel of school trust lands known today as the Goat Squeezer Project Area. The purpose of the harvest was to generate funds for the Montana public schools as well as to promote timber stand health and vigor. DNRC submitted the proposed timber harvest and sale to the Montana Board of Land Commissioners (Board) as required, and the Board approved the harvest and sale on July 21, 2003. In approving the proposal, the Board did not conduct a harvest-level accounting of the timber sale. Instead, the Board specifically evaluates costs and benefits at the programmatic, or year-end, level only.
¶5 Friends of the Wild Swan (FOWS), a nonprofit environmental group, challenged the Board’s methodology in evaluating timber sale transactions in the District Court, arguing that § 77-1-202, MCA (2003) *188 (henceforth § 77-1-202, MCA)[1] required harvest-specific accountings. The District Court, however, rejected that challenge and granted summary judgment to the Respondents. FOWS appealed to this Court on November 10, 2004.
STANDARD OF REVIEW
¶6 In granting summary judgment, the District Court ruled as a matter of law that § 77-1-202, MCA, did not require the Board to reconcile timber-sale costs and benefits at the harvest-level. No factual disputes are identified, and we review the District Court’s conclusions oflawde novo, determining their correctness. Steer, Inc. v. Department of Revenue (1990), 245 Mont. 470, 474-75, 803 P.2d 601, 603.
DISCUSSION
¶7 The issue of whether § 77-1-202, MCA, requires harvest-level accounting was one of four issues addressed by the District Court and is the only substantive issue raised on appeal. The District Court concluded that no “statute, constitution, rule, regulation, or case law” required the State to perform such specific accountings. The District Court pointed to the year-end accounting requirements as well as to mandated calculations and reporting methodologies as indications that the Legislature never intended to require more specific accountings. It also relied on the Legislature’s two-time rejection of bills which would have required harvest-level accounting in reaching its conclusion. See H.B. 605 (Mont. 2003), H.B. 576 (Mont. 2001). FOWS challenges that conclusion and asserts that the requirement of § 77-1-202, MCA, to “secure the largest measure of legitimate and reasonable advantage to the state” language is rendered meaningless without a harvest-level accounting requirement.

The Trust For Public Schools

¶8 Under the Act of February 22,1889 (the Enabling Act), the federal government granted Montana certain lands “for the support of common schools.” Enabling Act, § 10. The grant of those lands created *189 a trust for the people. Montanans for the Responsible Use of the School Trust v. Board of Land Commissioners, 1999 MT 263, ¶ 13, 296 Mont. 402, ¶ 13, 989 P.2d 800, ¶ 13 (Montrust I). Montana’s first Constitution accepted the lands which were granted on the terms of the Enabling Act, recognizing that they were held in trust and that the State acted as trustee. Montrust I, ¶ 13. Finally, Montana’s 1972 Constitution reaffirmed the land grant, the trust, and the terms of the Enabling Act. Art. X, Sec. 11, Mont. Const. (1972).
¶9 Pursuant to the Montana Constitution, the Board of Land Commissioners is directed to administer the trust and act as the accountable trustee. See Art. XI, Sec. 4, Mont. Const. (1889); Art. X, Sec. 4, Mont. Const. (1972). To assist the Board in fulfilling its responsibility as trustee, the Legislature enacted Sec. 3, ch. 60, L. 1927, today § 77-1-202, MCA, which outlined the Board’s obligations with regard to the language of the Enabling Act and the Montana Constitution. At the time this proceeding was initiated, the language outlining the trust responsibility had not changed in seventy years. It provided:
In the exercise of these powers, the guiding principle is that these lands and funds are held in trust for the support of education and for the attainment of other worthy objects helpful to the well-being of the people of this state as provided in The Enabling Act. The board shall administer this trust to secure the largest measure of legitimate and reasonable advantage to the state.
Section 77-1-202, MCA.

Deference to the Board

¶10 Initially, we note that the law affords discretion to the Board in its administration of the school land trust. In State v. Babcock (1966), 147 Mont. 46, 51, 409 P.2d 808, 811, we explained that “[T]he State Board of Land Commissioners has considerable discretionary power.... If the ‘largest measure of legitimate and reasonable advantage’ from the use of state lands is to accrue to the state, then the State Land Board must, necessarily, have a large discretionary power.” We further explained that this power was “inherent in the general and discretionary powers conferred by the constitution, and necessary for the proper discharge of its duties ....” Babcock, 147 Mont. at 51, 409 P.2d at 811. Finally, we affirmed that discretion in Montanans for the Responsible Use of the School Trust v. Darkenwald, 2005 MT 190, 328 Mont. 105, 119 P.3d 27 (Montrust IT), where, when faced with an evaluation of the Board’s method of determining “fair market value,” we stated, “we will not ‘control the discretion of the board unless it *190 appears that the action of the board is arbitrarily and, in effect, fraudulent.”’ Montrust II, ¶ 52 (citing Toomey v. State Bd. of Land Comm’rs (1938), 106 Mont. 547, 562, 81 P.2d 407, 415). This is not to say the Board has unfettered discretion, or that its discretion is unlimited. Babcock, 147 Mont. at 52, 409 P.2d at 811. However, it is clear that the Board’s obligation as trustee is a complex one, that the obligation is governed by constitutional and statutory provisions which grant authority to the Board over the trust, and that these provisions grant “large” or “considerable” discretion to the Board in the performance of its duties.
¶11 In addition to the discretion granted to the Board as the administrator of the trust, the law entitles the Board, as a state agency, to “respectful consideration” of its “long and continued course of consistent interpretation” of § 77-1-202, MCA, which it has administered for many years. Montana Power Co. v. Public Service Comm., 2001 MT 102, ¶ 25, 305 Mont. 260, ¶ 25, 26 P.3d 91, ¶ 25. This consideration can be overcome by “compelling indications.” Montana Power, ¶ 25; see also Glendive Med. Ctr. v. Mont. Dep’t of Public H.H.S., 2002 MT 131, ¶¶ 14-15, 310 Mont. 156, ¶¶ 14-15, 49 P.3d 560, ¶¶ 14-15.

Does § 77-1-202, MCA, require the Board to conduct a harvest-level accounting when considering timber sales on school trust lands?

¶12 FOWS argues that in order to fulfill the obligations under § 77-1-202, MCA, the Board must conduct a harvest-level accounting of every proposed trust-land timber sale before approving the project. In response, the Board argues that it fulfills its obligation under § 77-1-202, MCA, by conducting a program-wide accounting on a yearly basis, and notes that there is no proof that it has ever failed to secure “the largest measure of legitimate and reasonable advantage.” The question presented, therefore, is whether § 77-1-202, MCA, itself silent on accounting methodologies, requires the Board to conduct a harvest-level financial accounting.
¶13 As a matter of statutory interpretation, our goal is to ascertain the intent of the Legislature. McCormick v. Brevig, 2004 MT 179, ¶ 40, 322 Mont. 112, ¶ 40, 96 P.3d 697, ¶ 40; see also § 1-2-101, MCA. Our inquiry begins with the words of the statute itself: “The legislative intent is to be ascertained, in the first instance, from the plain meaning of the words used.” Western Energy Co. v. Dept. of Revenue, 1999 MT 289, ¶ 11, 297 Mont. 55, ¶ 11, 990 P.2d 767, ¶ 11; Brevig, ¶ 40.
*191 ¶14 First, we observe that the plain language of the statute, set forth above, does not require such accountings. In fact, the statute on its face requires no accountings at all. Instead, the statute simply requires the Board to “secure the largest measure of legitimate and reasonable advantage to the state.” Section 77-1-202, MCA. Of course, this Court may not “insert what has been omitted” when interpreting a statute. Section 1-2-101, MCA. This principle counsels against reading a specific accounting requirement into § 77-1-202, MCA.
¶15 However, FOWS argues that, despite the absence of an explicit requirement in the statute, we should reach a conclusion that the Board can fulfill its obligation to secure the largest measure of benefit to the state with regard to proposed timber sales only by conducting an accounting of all costs and benefits at the harvest level. FOWS reasons that a “comprehensive economic evaluation” is “implicit in the plain language of the statute,” particularly when the Board’s fiduciary role with regard to school trust lands is considered.
¶16 FOWS’s reference to the purposes which the Board must serve is not inappropriate. ‘We have many times stated that statutes must be read and considered in their entirety and the legislative intent may not be gained from the wording of any particular section or sentence, but only from a consideration of the whole.” State v. Heath, 2004 MT 126, ¶ 27, 321 Mont. 280, ¶ 27, 90 P.3d 426, ¶ 27 (citing Home Bldg. & Loan Ass’n of Helena v. Fulton (1962), 141 Mont. 113, 115, 375 P.2d 312, 313). We are to give effect to all statutory provisions within a statutory scheme. Section 1-2-101, MCA. The process of reading relevant statutory schemes in their entireties is what allows the Court to give true effect to the will of the Legislature. Dukes v. City of Missoula, 2005 MT 196, ¶ 14, 328 Mont. 155, ¶ 14, 119 P.3d 61, ¶ 14. Above, we have set forth the underpinnings of the Board’s trust obligation over school lands, and we now turn to the broader statutory structure governing that obligation.
¶17 While § 77-1-202 is itself silent about accounting obligations, there are provisions within the statutory scheme which illuminate the legislative intent regarding the Board’s accounting obligations. Section 77-1-223, MCA, “Forest land report to trust beneficiaries-contents,” and § 77-1-224, MCA, “Asset value and average return of revenue methods described,” detail the Board’s duties in reporting to trust beneficiaries, requiring yearly reports to the trust beneficiaries, and instructing how the trust assets must be valued. These statutes represent the Legislature’s affirmative efforts to require the Board to account for costs and profits in the timber-sale process. It is clear that *192 the accounting required by §§ 77-1-223 and 77-1-224, MCA, does not include harvest-level reconciliation.
¶18 In light of the explicit accounting directives set forth in these statutes, we are hard pressed to conclude that the Legislature somehow meant to imply a more specific accounting requirement within § 77-1-202, MCA, as urged by FOWS. To do so, we would need to determine that the Legislature “implicitly” required an accounting by way of § 77-1-202, MCA, which is silent on the issue, despite the fact it explicitly addressed the Board’s accounting requirements in other provisions of the same statutory scheme.
¶ 19 FOWS asserts that these other statutory accounting requirements are insufficient because they do not require the costs of individual sales, here the Goat Squeezer sale, to be calculated. It argues that, if the Board’s “economic analysis is flawed or incomplete,” the Board cannot demonstrate that it is securing the largest measure of legitimate and reasonable advantage.
¶20 This argument erroneously assumes that the “legitimate and reasonable advantage” which the Board must pursue is exclusively an economic one. While financial return is, without question, a vital purpose, it is not the Board’s only goal. The law recognizes the unique nature of the Board’s obligation to manage the school trust lands. Land trusts require maintenance efforts to ensure long-term sustainability, and the Board is thus forced to make “difficult to account for” decisions aimed at (1) ensuring long-term sustainability of school trust lands, while also (2) providing adequate resources to present beneficiaries. See Babcock, 147 Mont. at 53-54, 409 P.2d at 811; see also § 77-1-203, MCA. This duality of purpose is unique in the context of land and resource management because it requires a trustee to consider more than just immediate financial benefit in its decision making. Indeed, one purpose of the Goat Squeezer sale was to promote timber-stand health.
¶21 Further in this regard, § 77-1-203, MCA, “Multiple Use Management,” requires land management with the goal of promoting multiple purposes on the land, “so that... harmonious and coordinated management of the various resources, each with the other, will result without impairment of the productivity of the land ....” Section 77-1-203(l)(b), MCA. This statute evidences legislative recognition that in the context of trust land management, sustainable use and long-term forest health are important non-economic factors which the Board must also consider. Although the statutory directive to “secure the largest measure of legitimate and reasonable advantage” certainly *193 includes economics, the phrase is not limited in purpose to financial return, thus undercutting FOWS’s argument that there must be additional accounting efforts in order to comply with it.
¶22 We concede that additional information and analysis is always possible, and may very well be advantageous. Certainly, a limb by limb, tree by tree, or acre by acre accounting is theoretically possible in the context of a timber sale, and undoubtedly such accountings would help the Board in its evaluation of proposed timber sales. Indeed, one could envision many things which could be read into the language of “secure the largest benefit” that would aid in the performance of the Board’s duties. Of course, at some level, additional analysis would probably be prohibitively expensive and counterproductive. The point, however, is that it is not the duty of this Court to decide what accounting measures would best serve the Board in the fulfillment of its obligations. Those are matters for the Board and the Legislature.
¶23 Given the lack of evidence to the contrary, we cannot conclude that the Board, in view of the multiple purposes it must fulfill with regard to school trust lands, the deference which the law provides in its administration of school trust lands, and current statutory accounting requirements, has not or cannot secure the largest measure of benefit without a harvest-level accounting of timber sales. Consequently, we conclude that such a requirement is not implicit within § 77-1-202, MCA.

Strict Accountability

¶24 Finally, we address FOWS’s brief argument that harvest-level accounting is required under § 77-1-202, MCA, by virtue of the “strict accountability’ requirement of Article VIII, Section 12 of the Constitution, which provides:
Strict accountability. The legislature shall by law insure strict accountability of all revenue received and money spent by the state and counties, cities, towns, and all other local governmental entities.
¶25 Interpreting this provision, we have stated that “[t]he Constitution indicates that the strict accountability function is not self-executing.” Reep v. Board of County Commissioners (1981), 191 Mont. 162, 169, 622 P.2d 685, 689. The provision directs the legislature to implement the provision “by law,” and, as such, it is up to the Legislature to create the statutory means which ensure “strict accountability.” In Reep, the Legislature, in the context of county government audits, required the Department of Community Affairs to *194 conduct “comprehensive audits,” instead of leaving that task to the county auditor. Reep, 191 Mont. at 169, 622 P.2d at 688-89. The effect of that decision was to recognize that the Legislature had significant discretion in creating a statutory scheme which satisfied the “strict accountability” mandate. See also, Grossman v. State Dep’t of Natural Res. (1984), 209 Mont. 427, 464, 682 P.2d 1319, 1338 (holding that DNRC’s issuance of coal tax severance bonds for water resource development did not violate the strict accountability requirement). Such discretion is necessary given the breadth and diversity of monies spent and received by various agencies of the State of Montana, and the peculiar accounting difficulties that may be faced in some agencies and not in others.
¶26 Here, the Legislature responded to the need for strict accountability by enacting, § 77-1-223, MCA, requiring annual detailed trust reports to all beneficiaries, and § 77-1-224, MCA, describing exactly how certain revenue must be calculated and reported to the beneficiaries. These provisions constitute the Legislature’s effort to ensure accountability.
¶27 FOWS does not argue that these statutes are unconstitutional for failing to ensure “strict accountability.” Instead, it appears to argue that § 77-1-202, MCA, must be read as requiring harvest-level accounting to give effect to the constitutional mandate for strict accountability. However, the Legislature clearly addressed “strict accountability” of trust revenues and administration costs by enacting the statutes addressed above. We cannot conclude that, in order to ensure strict accountability, a harvest-level accounting requirement must also be mandated.

Conclusion

¶28 As the United States Supreme Court noted in Chevron U.S.A. v. N.R.D.C. (1984), 467 U.S. 837, 865, 104 S.Ct. 2779, 2793, 81 L.Ed.2d 694, 717, “judges are not experts in the field, and are not part of either political branch of the Government. Courts must, in some cases, reconcile competing political interests, but not on the basis of the judges’ personal policy preferences.” It may be easy to second-guess the Board’s approach of conducting programmatic review of timber sales and the Legislature’s two-time rejection of bills requiring harvest-level accounting of timber sales. However, the question here is not whether more specific accounting is preferable or even desirable. Rather, the question is whether harvest-level accounting of proposed timber sales is required by law. After review of the Enabling Act, the Montana Constitution, and the statutory scheme, we conclude that the Board is *195 not required by law to conduct harvest-level review of timber sales. Therefore, we conclude that the Board is not in violation of § 77-1-202, MCA, when it forgoes harvest-level financial reconciliation. Consequently, the request of FOWS for attorney fees is also denied. ¶29 Affirmed.
CHIEF JUSTICE GRAY, JUSTICES WARNER and MORRIS concur.

 The 2005 Legislature amended § 77-1-202(1), MCA, which now reads, in pertinent part:
The Board shall administer this trust to:
(a) secure the largest measure of legitimate and reasonable advantage to the state; and
(b) provide for the long-term financial support of education.
The amendments were effective July 1,2005. FOWS brought this suit prior to that date, challenging the timber sale pursuant to the 2003 version of the statute. All future references to this section herein are to subsection (1) of the 2003 version of the statute.