**FILED**

10/25/2017

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 16-0716

DA 16-0716

IN THE SUPREME COURT OF THE STATE OF MONTANA

2017 MT 258

ELAINE MITCHELL, and all others
similarly situated,

      Plaintiffs and Appellants,

    v.

GLACIER COUNTY, and STATE OF
MONTANA,

      Defendants and Appellees.

APPEAL FROM:   District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. ADV-2015-631
Honorable Mike Menahan, Presiding Judge

COUNSEL OF RECORD:

    For Appellants:

        Lawrence A. Anderson (argued), Attorney at Law, P.C., Great Falls,
Montana

    For Appellees:

        Kirk D. Evenson (argued), Marra, Evenson & Bell, P.C., Great Falls,
Montana
        (*Attorney for Glacier County*)

        Gary M. Zadick, James R. Zadick (argued), Ugrin, Alexander, Zadick
& Higgins, P.C., Great Falls, Montana
        (*Attorneys for State of Montana*)

          Argued:   August 9, 2017
    Submitted:  August 22, 2017
      Decided:  October 25, 2017

Filed:

_____
               Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1     Elaine Mitchell, a resident of Glacier County, began paying her property taxes under protest in 2015 in response to an independent audit that revealed deficiencies in the County's budgeting and accounting practices.  Mitchell, on behalf of herself and other County residents, sued the County over its alleged financial mismanagement and the State over its failure to take legal action against the County.  The District Court dismissed the suit on the ground that Mitchell and the putative class (collectively Taxpayers) did not have standing to sue either the County or the State.  Taxpayers appeal.  We affirm.

## PROCEDURAL AND FACTUAL BACKGROUND

¶2     Taxpayers own real property and pay property taxes in Glacier County.  They have been paying their taxes under protest in response to a March 2015 independent audit of the County's finances for fiscal years 2013 and 2014.  The audit identified budget deficits in numerous County funds and stated that the County had exceeded its budgetary authority in many of those funds.  A subsequent County Treasurer's report showed ongoing deficit balances in a number of the County's funds.

¶3     Taxpayers sued Glacier County and the State of Montana, alleging that both entities had failed to comply with budgeting and accounting laws.  They asked the District Court for numerous forms of relief, including:  (1) permission to prosecute the case as private attorneys general; (2) a declaration that the County had failed to comply with generally accepted governmental accounting standards; (3) a declaration that the County was in violation of laws designed to ensure "strict accountability" of government finances; (4) a

2

declaration that County officials who incurred financial obligations in excess of appropriations were personally liable for the resulting budget deficits; (5) an order requiring the State to withhold public funds from the County under the Single Audit Act until the County complied with its budgeting obligations; (6) an order requiring the State to hold County officials personally liable for their failure to ensure strict accountability; (7) an order appointing a receiver for the County; (8) permission to prosecute the case as a class action; (9) an order allowing Taxpayers to continue paying their taxes under protest until the County complied with its budgetary duties; and (10) a determination that the County violated Taxpayers' right to know under the Montana Constitution.

¶4    In their Second Amended Complaint, Taxpayers made the following assertion regarding their alleged injury:

> Based on the 2013 and 2014 Audits of the county, and the deficiencies described therein, it is foreseeable that the county's residents and taxpayers would be injured as a result of the State's failure to enforce the terms of the Single Audit Act to "insure strict accountability of all revenues received and money spent" by the county.

Taxpayers moved for partial summary judgment, and the State and County challenged Taxpayers' standing to sue.

¶5    The District Court denied Taxpayers' motion for partial summary judgment, denied class certification, and dismissed the case for lack of standing. It explained that Taxpayers had "failed to demonstrate [they have] suffered a concrete injury to [their] property or to [their] individual constitutional or statutory rights sufficient to establish standing under Montana law." It reasoned that Taxpayers' "vague, speculative statement" that it was

3

"foreseeable that the county's residents and taxpayers would be injured" was insufficient to establish the injury requirement for standing. The court noted that the legal provisions under which Taxpayers alleged injury—Article VIII, Section 12, of the Montana Constitution and the Single Audit Act, Title 2, chapter 7, Part 5, MCA—did not establish private rights and did not grant Taxpayers the right to judicial relief. Taxpayers appeal the court's dismissal of their case.

## STANDARD OF REVIEW

¶6 Standing is one of several justiciability doctrines that limit Montana courts to deciding only cases and controversies. *Heffernan v. Missoula City Council*, 2011 MT 91, ¶ 29, 360 Mont. 207, 255 P.3d 80. The determination of a party's standing to maintain an action is a question of law that we review de novo. *Heffernan*, ¶ 28.

## DISCUSSION

¶7 Taxpayers argue that they have standing to sue the County over its alleged financial mismanagement and to sue the State over its failure to hold County officials accountable for their unlawful actions. They contend that the County and the State violated Montana budgeting and accounting laws and that it is "foreseeable" that these violations will cause Taxpayers to "suffer additional property tax burdens because of the County's unauthorized deficit spending, accounting failures, and disregard of audits." They assert also that they should be permitted to pursue this suit under the private attorney general doctrine and the Declaratory Judgments Act.

4

¶8 Taxpayers seek the following specific remedies on appeal: (1) a declaration that they may continue to pay taxes under protest until the County complies with its statutory duties; (2) a declaration that the County is in violation of the laws that implement the "strict accountability" provision of the Montana Constitution; (3) an order requiring the State to withhold public funds from the County under the Single Audit Act until the County complies with its responsibilities; (4) an order requiring the State to hold County officials accountable under the law for their financial mismanagement; (5) an order appointing a receiver for the County; and (6) a declaration that the County has violated their right to know under the Constitution.[1]

¶9 Courts lack "power to resolve a case brought by a party without standing—i.e., a personal stake in the outcome—because such a party presents no actual case or controversy." *Heffernan*, ¶ 29. Standing is a threshold jurisdictional requirement. *Heffernan*, ¶ 29. "There are two elements to standing: the case-or-controversy requirement imposed by the Montana Constitution, and judicially created prudential limitations imposed for reasons of policy." *Schoof v. Nesbit*, 2014 MT 6, ¶ 15, 373 Mont. 226, 316 P.3d 831 (citing *Heffernan*, ¶ 31).

---

[1] Although Taxpayers state on appeal that the County violated their constitutional right to know, they make no argument as to how the County violated this right. "[W]e are not obligated to develop arguments on behalf of parties to an appeal, nor are we to guess a party's precise position, or develop legal analysis that may lend support to his position." *McCulley v. Am. Land Title Co.*, 2013 MT 89, ¶ 20, 369 Mont. 433, 300 P.3d 679. We therefore decline to address Taxpayers' contention that the County violated their right to know.

¶10    Under the constitutional case-or-controversy requirement, the plaintiff must show, "at an irreducible minimum," that he or she "has suffered a past, present, or threatened injury to a property or civil right, and that the injury would be alleviated by successfully maintaining the action." *Schoof*, ¶ 15 (citation and internal quotations omitted); *accord Chipman v. Nw. Healthcare Corp.*, 2012 MT 242, ¶¶ 26-27, 366 Mont. 450, 288 P.3d 193. The alleged injury must be "concrete" rather than "abstract." *Schoof*, ¶ 20 (citation and internal quotations omitted). To qualify as "concrete," an injury must be "actual or imminent, not conjectural or hypothetical." *Heffernan*, ¶ 32. In other words, "the plaintiff must show that he has sustained, or is in immediate danger of sustaining some direct injury . . . and not merely that he suffers in some indefinite way in common with people generally." *Schoof*, ¶ 20 (citation and internal quotations omitted).

¶11    A plaintiff's standing may arise from an alleged violation of a constitutional or statutory right. *See Schoof*, ¶ 23 (holding that plaintiff's allegation that County Commissioners violated his constitutional and statutory rights to know and to participate by adopting a policy at an unannounced meeting satisfied standing requirements). The Legislature "may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute." *Heffernan*, ¶ 34 (citation and internal quotations omitted). If the alleged injury "is premised on the violation of constitutional and statutory rights, standing depends on whether the constitutional or statutory provision . . . can be understood as granting persons in the plaintiff's position a right to judicial relief." *Schoof*, ¶ 21 (citation and internal quotations omitted). "[I]n all

6

events," however, "the standing requirements imposed by the Constitution"—i.e., a showing of an alleged injury—"must always be met." *Heffernan*, ¶ 34.

¶12    Article VIII, Section 12, of the Montana Constitution provides, "The legislature shall by law insure strict accountability of all revenue received and money spent by the state and counties, cities, towns, and all other local governmental entities." The Legislature responded to this directive by enacting the Single Audit Act, §§ 2-7-501 to -522, MCA, and the Local Government Budget Accounting Act, §§ 7-6-4001 to -4036, MCA.

¶13    The Local Government Budget Accounting Act requires local government officials to not "make a disbursement or an expenditure or incur an obligation in excess of the total appropriations for a fund." Section 7-6-4005(1), MCA. Further, "A local government official who violates subsection (1) is liable for the amount of the excess disbursement, expenditure, or obligation personally." Section 7-6-4005(2), MCA. "[T]he governing body, each county or municipal official, and the district courts are limited to the amount of appropriations and by the classifications in the annual appropriation resolution provided for in 7-6-4030 when making disbursements or expenditures or incurring liabilities." Section 7-6-4033, MCA.

¶14    The Legislature enacted the Single Audit Act in part to "improve the financial management of local government entities with respect to federal, state, and local financial assistance." Section 2-7-502(2)(a), MCA. This Act directs the Montana Department of Administration (Department) to "prescribe by rule the general methods and details of accounting for the receipt and disbursement of all money belonging to local government

7

entities" and to establish a uniform financial reporting system for such entities. Sections 2-7-503(2), -504(1), MCA. Local government entities must "conform with the accounting standards prescribed by the department." Section 2-7-504(1), MCA.

¶15 Under the Single Audit Act, local government entities must submit to independent financial audits every two years. Section 2-7-503(3), MCA. Once an entity receives a completed audit report, the entity must file the report with the Department and inform the Department what corrective actions it plans to take in response to "deficiencies or recommendations contained in the audit report." Sections 2-7-514(1), -515(1), MCA. Local government entities must "adopt measures to correct the report findings" and submit a "corrective action plan to the department." Section 2-7-515(3), MCA.

¶16 If a local government entity fails "to resolve findings or implement corrective measures," the Act provides that such failure "shall result in the withholding of financial assistance in accordance with rules adopted by the department pending resolution or compliance." Section 2-7-515(3), MCA. If an officer or employee of a local government entity violates the law or fails to perform a duty, that individual "must be proceeded against by the attorney general or county, city, or town attorney as provided by law." Section 2-7-515(4), MCA. "If the county, city, or town attorney fails or refuses to prosecute the case, the department may refer the case to the attorney general to prosecute the case." Section 2-7-515(4), MCA. The Department also may withhold financial assistance from or issue fines to a local government entity that fails to comply with financial reporting requirements. Section 2-7-517(1)-(2), MCA.

8

¶17 Pursuant to the Single Audit Act, the County submitted to an independent audit of its finances for fiscal years 2013 and 2014. The audit report begins with a statement of the County's "Net Position." For 2013, the report lists the County's total assets at $17,356,224, its total liabilities at $6,349,818, and its resulting "Total net position" at $11,006,406. The report states further that, for 2014, the County's total assets were $16,626,470, its total liabilities were $6,036,077, and its "Total net position" was $10,590,393. The report also summarizes the County's revenues and expenditures for each fiscal year. The County's total combined expenditures among its various funds exceeded revenues by $384,256 in 2013 and by $216,434 in 2014.

¶18 The audit report proceeds with a discussion of the financial state of the County's individual funds. For 2013, the report notes that the General fund, the Road fund, the Ambulance fund, and "Other Governmental Funds" had positive fund balances, while the Public Safety (Law Enforcement) fund, the Glacier County Transit fund, the Sheriff Law Enforcement Grant, the Community Transportation Enhancement Program (CTEP), and the DEQ/DOE/ARRA Grant posted deficit fund balances. For 2014, the report again identifies the General fund, the Ambulance fund, and "Other Governmental Funds" as having positive balances; the Road fund, the Public Safety (Law Enforcement) fund, CTEP, the Museum fund, the Glacier County Transit fund, the Sheriff Law Enforcement Grant, the Glacier County Ambulance Capital fund, and the DEQ/DOE/ARRA Grant all had deficit balances. The report notes that the funds with deficit balances "will not have adequate amount of resources to cover expenditures or pay liabilities" and that the County

9

had exceeded its budgetary authority with respect to many of those funds. Despite these deficit balances in many of the County's individual funds, the report states that the County's "Total Government Funds" balance stood at $4,208,721 for 2013 and at $4,038,997 for 2014.

¶19 The audit report includes findings of "certain deficiencies in internal control" that the auditors considered "material weaknesses." The report highlights instances of different County departments or funds failing to maintain accurate ledgers or proper records of assets or cash transactions. The report also discusses the County's efforts at compliance with its financial obligations and its attempts to correct the deficiencies that the audit identified. The report notes that the "County complies with generally accepted accounting principles" and with relevant "Governmental Accounting Standards Board (GASB) pronouncements." For each fund that the report identifies as having a negative balance, it contains brief descriptions under the heading, "How Deficit will be Eliminated," of the County's plans to balance that fund's budget.

¶20 In the "Schedule of Findings and Questioned Costs," the report notes the County's budgeting and accounting deficiencies with regard to specific funds, departments, and financial practices. In response to each deficiency listed, the report summarizes the County's planned response under the heading, "Views of Responsible Officials and Planned Corrective Action." For instance, with respect to the report's finding that the Ambulance Fund inadequately accounted for its revenues, the report states, "The County plans to implement policies and procedures requiring the entry of revenues when report is

10

received from EMS, and performing a monthly reconciliation to determine if error exists." Finally, the audit notes that the "prior audit report contained twenty five recommendations" for improving the County's financial management. The audit reports that, of those twenty-five recommendations, the County has "implemented" eighteen. The audit lists seven recommendations as "repeated" from the previous audit, meaning that the County has yet to implement those recommendations.

¶21 Taxpayers assert that the audit demonstrates the County's financial mismanagement and their threatened injury from the State and local entities' failures to address this mismanagement.

## A. Taxpayers' Standing to Sue the State.

¶22 Taxpayers argue that they have standing to sue the State because the State has failed to enforce the law against the County for its alleged financial mismanagement. They contend that the State has not fulfilled its fiduciary duty to ensure "strict accountability" under the Constitution and that the State has abdicated its enforcement obligations under the Single Audit Act. In Taxpayers' view, these alleged failures violate their rights and grant them standing to sue the State.

¶23 We have held that "non-self-executing clauses of constitutions are non-justiciable political questions." *Columbia Falls Elem. Sch. Dist. No. 6 v. State*, 2005 MT 69, ¶ 15, 326 Mont. 304, 109 P.3d 257 (hereafter *Columbia Falls*). A constitutional provision that is "addressed to the Legislature" is "non-self-executing." *Columbia Falls*, ¶ 16. Article VIII, Section 12, of the Montana Constitution addresses the Legislature and requires it to

11

take action to ensure "strict accountability." For this reason, the "strict accountability" clause of Article VIII, Section 12, is not self-executing. *Friends of the Wild Swan v. Dep't of Natural Res. & Conservation*, 2005 MT 351, ¶ 25, 330 Mont. 186, 127 P.3d 394 (citing *Reep v. Bd. of Cnty. Comm'rs*, 191 Mont. 162, 169, 622 P.2d 685, 689 (1981)). The clause therefore is non-justiciable. *See Columbia Falls*, ¶ 15.

¶24 Taxpayers nonetheless argue that, according to our holding in *Columbia Falls*, the State's alleged violations of the legislation implementing the "strict accountability" clause—namely the Single Audit Act—grant them standing. In *Columbia Falls*, we held that the plaintiffs had standing to sue the State over its administration and funding of public schools, which allegedly violated Article X, Section 1(3), of the Montana Constitution. *Columbia Falls*, ¶ 19. That provision mandates that the Legislature "provide a basic system of free quality public elementary and secondary schools." Mont. Const. art. X, § 1(3). We explained that this constitutional provision "must be read in conjunction with Section 1 of Article X, which guarantees a right to education." *Columbia Falls*, ¶ 19. The constitutional provision at issue in *Columbia Falls* thus implicated the express constitutional right to an education. *Columbia Falls*, ¶ 19. We noted that once the Legislature has "executed" a constitutional provision "that implicates individual constitutional rights, courts can determine whether that enactment fulfills the Legislature's constitutional responsibility." *Columbia Falls*, ¶ 17 (citation and internal quotations omitted).

¶25 By contrast to *Columbia Falls*, the "strict accountability" clause does not implicate specific "individual constitutional rights." *Columbia Falls*, ¶ 17. It directs the Legislature

12

to pass legislation ensuring strict accountability of revenue. Mont. Const. art. VIII, § 12. Unlike with Article X, Section 1(3), which, when "read in conjunction" with the Constitution's right to an education, grants individual constitutional rights, there is no separate individual constitutional right to "strict accountability" of revenues. *Columbia Falls*, ¶ 19. The "strict accountability" clause therefore cannot "be understood as granting persons in [Taxpayers'] position a right to judicial relief." *Schoof*, ¶ 21.

¶26 Taxpayers' reliance on *Columbia Falls* would be more apropos to an argument that the Legislature's enactments under Article VIII, Section 12—i.e., the Single Audit Act and the Local Government Budget Accounting Act—failed to "fulfill[ ] the Legislature's constitutional responsibility" of ensuring "strict accountability of all revenue." *Columbia Falls*, ¶ 17; Mont. Const. art. VIII, § 12; *see Friends of the Wild Swan*, ¶ 25. Taxpayers do not allege that the Legislature failed to comply with its constitutional mandate when it enacted these Acts. Their allegations of violations of the "strict accountability" clause therefore are not justiciable and do not establish standing.

¶27 Taxpayers respond that "the implementing statutes confer rights" and that the Court must hold the Executive Branch accountable as a co-equal branch for carrying out its obligations under the Constitution. Yet the Legislature defines the Executive Branch's accountability through its legislative enactments. *See, e.g., Friends of the Wild Swan*, ¶ 25. Here, the Legislature enacted laws—such as the Single Audit Act—that set forth the Executive Branch's responsibility for enforcing the "strict accountability" clause of the Constitution. *See* §§ 2-7-501 to -522, MCA. That clause does not allow a claim

13

independent of the statutes that implement it. *See Friends of the Wild Swan*, ¶ 25. We thus turn to the legislative enactment implementing the "strict accountability" clause—the Single Audit Act—of which Taxpayers claim the State has run afoul.

¶28     Taxpayers argue that the State violated the terms of the Single Audit Act and that they may sue the State to redress these alleged violations. Taxpayers do not argue that the Single Audit Act expressly confers private rights of action on individuals in Taxpayers' position. *See generally* §§ 2-7-501 to -522, MCA. They contend instead that the Act obligated the State to withhold financial assistance from the County and that they may sue to compel the State to take legal action against local officials because "every person who suffers detriment from the unlawful act of another has a remedy" under Montana law. (Citing § 27-1-202, MCA.)

¶29     The Act provides that, when a local government entity fails to comply with financial reporting requirements, "the department *may* issue an order stopping payment of any state financial assistance to the local government entity." Section 2-7-517(1), MCA (emphasis added). It provides further that, after an entity submits a corrective action plan to the Department, "Failure to resolve findings or implement corrective measures shall result in the withholding of financial assistance in accordance with rules adopted by the department pending resolution or compliance." Section 2-7-515(3), MCA. Under the corresponding Department rule,

> If the department does not receive an acceptable response or corrective action plan [from the local government entity] . . . it can request, pursuant to 2-7-515, MCA, that state agencies withhold payments of financial assistance from the local government entity pending receipt of an acceptable response

14

or corrective action plan. The department, after consultation with the appropriate state agency or agencies, may designate the financial assistance payments to be withheld.

Admin. R. M. 2.4.409(12).

¶30 The plain language of the Single Audit Act gives the Department authority to review a local government's audit response and to determine whether to withhold financial assistance. The Act's directive that an entity's "[f]ailure to resolve findings or implement corrective measures *shall* result in the withholding of financial assistance" is followed by language bestowing discretion on the Department to craft rules determining the circumstances under which such withholding will occur. Section 2-7-515(3), MCA. The statute does not dictate the Department's sufficiency review, does not impose a time limit or specific requirements for an entity's submission of a corrective action plan to the Department, and does not direct the manner in which the local government entity must "resolve findings or implement corrective measures." Section 2-7-515(3), MCA. The Department's corresponding rule states that it *may* withhold financial assistance *if* it "does not receive an acceptable response or corrective action plan" from the County. Admin. R. M. 2.4.409(12). Taxpayers do not challenge the validity of the rule. Read in conjunction, § 2-7-515(3), MCA, and Admin. R. M. 2.4.409(12), provide the Department discretion to determine whether and how to withhold financial assistance from local government entities.

¶31 The Single Audit Act provides:

In cases where a violation of law or nonperformance of duty is found on the part of an officer, employee, or board, the officer, employee, or board must

15

be proceeded against by the attorney general *or* county, city, or town attorney *as provided by law* . . . If the county, city, or town attorney fails or refuses to prosecute the case, the department *may* refer the case to the attorney general to prosecute the case.

Section 2-7-515(4), MCA (emphases added). Taxpayers argue that this language requires the State to prosecute County officials. The plain language of the statute, however, states that the Department *may* refer officials for prosecution *if* the local attorney declines to prosecute the case. Section 2-7-515(4), MCA. And prosecuting authorities are "provided by law," § 2-7-515(4), MCA, with broad discretion to determine when to undertake criminal actions, *State v. Strong*, 2015 MT 251, ¶ 23, 380 Mont. 471, 356 P.3d 1078 ("[W]e afford prosecutors 'broad discretion to determine whether to prosecute an offender and what offense to charge.'") (quoting *State v. Tichenor*, 2002 MT 311, ¶ 26, 313 Mont. 95, 60 P.3d 454). The statute thus does not mandate the Department's prosecution of local government officials.

¶32    Although the Single Audit Act grants the Department authority to take enforcement action against local government entities that fail to comply with their financial duties, it affords the Department wide latitude in determining when and under what circumstances to take action. *See* §§ 2-7-515(3), (4), MCA. A party in Taxpayers' position cannot compel the State to take discretionary action. *See Doty v. Mont. Comm'r of Political Practices*, 2007 MT 341, ¶ 15, 340 Mont. 276, 173 P.3d 700 (holding that a writ of mandamus cannot "compel performance of a discretionary function"). Taxpayers therefore cannot show that their claims against the State assert a legally cognizable injury to a civil right sufficient to confer standing. *See Schoof*, ¶ 15.

16

¶33 In addition, § 27-1-202, MCA, does not support Taxpayers' argument for standing. It reflects established principles of standing by requiring that a person "suffer[ ] detriment" in order to be entitled to a remedy. For the reasons discussed below, we conclude that Taxpayers have not demonstrated that their claimed potential for increased property taxes in response to the County's financial situation constitutes a concrete injury sufficient to confer standing in this case.

### B. Taxpayers' Standing to Sue the County.

¶34 Taxpayers assert that the County is running a budget deficit and that it does not have sufficient financial resources to meet its obligations. They allege that this deficit threatens them with economic injury because it is "foreseeable" that the County will raise property taxes to compensate for its imbalanced budget. Taxpayers argue further that the County has violated statutes that implement the "strict accountability" clause of the Montana Constitution—including the Single Audit Act and the Local Government Budget Accounting Act—and that these violations confer standing on them. Taxpayers assert that the County's financial violations are ongoing.

¶35 Taxpayers argue that our holding in *Helena Parents Commission v. Lewis and Clark County Commissioners*, 277 Mont. 367, 922 P.2d 1140 (1996), supports their contention that the County's financial deficiencies threaten them with increased property taxes and give them standing to sue. The plaintiffs in *Helena Parents Commission* sued the county and the school district, alleging that the defendants had improperly invested public funds. *Helena Parents Comm'n*, 277 Mont. at 370, 922 P.2d at 1142. The plaintiffs' complaint

17

specifically alleged that the county's and the school district's actions had resulted in a loss of approximately $5.5 million, as a result of which the local government would need to raise revenues and reduce public services in order to compensate for the loss. *Helena Parents Comm'n*, 277 Mont. at 370, 922 P.2d at 1142. In holding that the plaintiffs had standing to sue, we explained that "plaintiffs alleged that the government will impose tax burdens on them as it seeks to recoup losses and that the investments will result in a lessening of governmental services. These allegations of an economic injury satisfy the injury requirement." *Helena Parents Comm'n*, 277 Mont. at 372, 922 P.2d at 1143.

¶36　This case differs significantly from *Helena Parents Commission*. First, the contested issue—and the focus of our analysis in that case—was on the second requirement for standing: whether the alleged injury was distinguishable from the injury to the public generally. *Helena Parents Comm'n*, 277 Mont. at 372-74, 922 P.2d at 1143-44. Second, unlike the *Helena Parents* plaintiffs, Taxpayers did not specifically allege in their complaints that the County's financial mismanagement resulted in a quantifiable amount of overspending that would require an increase in property taxes. Taxpayers' second amended complaint states only that, based on the "deficiencies" described in the audit, "it is *foreseeable* that the county's residents and taxpayers would be injured." (Emphasis added.) Taxpayers have not made concrete allegations that the County squandered a specific amount of money that it would need to recoup through increased property taxes. *See Helena Parents Comm'n*, 277 Mont. at 372, 922 P.2d at 1143. *Helena Parents Commission* is not analogous.

18

¶37    The audit findings would not support such allegations in any event. The audit report notes the County's financial deficiencies, including budget deficits in numerous individual funds and expenditures in excess of revenues. Yet the report shows that the County's "Total Government Funds" balance stood at $4,208,721 for 2013 and at $4,038,997 for 2014. Its "Total net position"—the difference between its assets and its liabilities—was $11,006,406 for 2013 and $10,590,393 for 2014. The report thus shows that the County has more than adequate financial resources to meet its liabilities. The fact that the County has inadequately budgeted for certain funds does not require it to raise revenue to balance those funds. It conceivably could use its overall surplus in assets and its excess "Total Government Funds" balance to redistribute money across its individual funds so that all are balanced. Whether such actions would comply with State budgetary laws or recognized accounting principles is not the issue here. The threshold problem is that Taxpayers cannot show, based on the audit report, that the threat of the County raising property taxes is "actual or imminent," rather than "conjectural or hypothetical." *Heffernan*, ¶ 32; *see Schoof*, ¶ 20.

¶38    Taxpayers contend, however, that the County's failure to take corrective action to cure its alleged financial violations supports their position that tax increases are foreseeable. The report, though, summarizes the County's responses to its financial deficiencies and reflects its continuing efforts to implement proper financial management strategies. For each deficiency in the County's funds, departments, and financial practices that the report identifies, it describes the County's planned corrective action. The report

19

states that County officials were aware of negative cash balances in some of the County's major funds and that the County had "implemented a more conservative plan in making only the essential expenditure transactions." It notes further that the County has adopted eighteen of the twenty-five recommendations from the prior audit report. The face of the audit demonstrates where the County has taken and continues to take corrective action to remedy its deficiencies. Again, the allegations fall short of the concrete injury needed to demonstrate standing. Taxpayers' alleged foreseeable economic injury therefore is insufficient to satisfy the constitutional "case-or-controversy" requirement for standing to sue the County. *Schoof*, ¶ 15.

¶39 Taxpayers argue further that the County would be immunized for its alleged violations of the Single Audit Act and the Local Government Budget Accounting Act if the Court fails to grant them standing to seek judicial review of the County's financial mismanagement. Taxpayers rely in part on our holding in *Grossman v. Department of Natural Resources*, 209 Mont. 427, 682 P.2d 1319 (1984), for their contention that the County's alleged statutory violations are sufficient to establish standing. They highlight our statement that "[w]e will recognize the standing of a taxpayer, without more, to question the state constitutional validity of a tax or use of tax monies where the issue or issues presented directly affect the constitutional validity of the state or its political subdivisions acting to collect the tax, issue bonds, or use the proceeds thereof." *Grossman*, 209 Mont. at 438-39, 682 P.2d at 1325. As the District Court observed, Taxpayers do not "challenge the constitutional validity of Glacier County's collection of taxes nor its use of

20

the funds." Taxpayers allege that the County committed errors in its budgeting and accounting of revenues, not that its collection or expenditures of the funds was unconstitutional. *Grossman* therefore does not apply.

¶40 Instead, the above analysis resolves Taxpayers' claim. As Taxpayers implicitly acknowledge, neither the Single Audit Act nor the Local Government Budget Accounting Act contains any express provision granting private rights of action to individuals in Taxpayers' position. But even if the County violated one or more provisions of these Acts—a question that we do not decide here—Taxpayers have not shown, "at an irreducible minimum," that they have "suffered a past, present, or threatened injury" that "would be alleviated by successfully maintaining the action." *Schoof*, ¶ 15. Without demonstrating a concrete injury, Taxpayers cannot establish standing to sue for violations of the Single Audit Act or the Local Government Budget Accounting Act. *See Schoof*, ¶ 20.

## C. Taxpayers' Additional Standing Theories.

¶41 Finally, Taxpayers invoke the private attorney general doctrine and the Declaratory Judgments Act as additional bases for standing. The private attorney general doctrine allows parties in certain cases to recover attorney fees "when the government, for some reason, fails to properly enforce interests which are significant to its citizens." *Clark Fork Coalition v. Tubbs*, 2017 MT 184, ¶ 14, 388 Mont. 205, 399 P.3d 295 (citation and internal quotations omitted). The private attorney general doctrine entitles a party to seek and recover attorney fees. *See Clark Fork Coalition*, ¶¶ 15-16. It is not a cause of action.

21

Taxpayers cite no authority that the doctrine establishes a right to judicial relief independent of recognized standing requirements.

¶42 The Declaratory Judgments Act provides, "Any person . . . whose rights, status, or other legal relations are affected by a statute . . . may have determined any question of construction or validity arising under the . . . statute . . . and obtain a declaration of rights, status, or other legal relations thereunder." Section 27-8-202, MCA. We have held that "the requirement of justiciable controversy [ ] applies to declaratory judgment actions." *Marbut v. Sec'y of State*, 231 Mont. 131, 135, 752 P.2d 148, 150 (1988). As discussed earlier in this Opinion, Taxpayers have not adequately alleged a concrete, threatened injury, and therefore have not established standing. Without an independent ground for standing, they cannot assert a claim under the Declaratory Judgments Act. *See Marbut*, 231 Mont. at 135-36, 752 P.2d at 151 ("[W]e have found no case granting standing to a complainant or applicant who shows no injury or threatened injury."). Neither the private attorney general doctrine nor the Declaratory Judgments Act grants Taxpayers standing to seek relief in this case.

## CONCLUSION

¶43 The District Court determined correctly that Taxpayers lack standing to sue either the County or the State. The judgment is affirmed.

/S/ BETH BAKER

We Concur:

22

/S/ MIKE McGRATH
/S/ LAURIE McKINNON
/S/ JAMES JEREMIAH SHEA
/S/ DIRK M. SANDEFUR
/S/ JIM RICE

Justice Michael E Wheat, dissenting.

¶44    I respectfully dissent from the majority. I would reverse and remand because the Taxpayers have standing to go forward with the lawsuit against Glacier County. In my opinion, the majority improperly finds that the Taxpayers have failed to allege an injury.

¶45    The majority's attempt to distinguish *Helena Parents Commission* is unavailing. The majority distinguishes the case at hand from *Helena Parents Commission* on two grounds: (1) the foremost issue in *Helena Parents Commission* was not whether an alleged injury had occurred, and (2) the plaintiffs in *Helena Parents Commission* alleged a quantifiable injury. Opinion, ¶ 36. As to the first ground, whether the issue was the foremost issue in the case is irrelevant. The Court in *Helena Parents Commission* concluded that the plaintiffs had alleged an injury to satisfy the standing requirement. *Helena Parents Comm'n*, 277 Mont. at 372, 922 P.2d at 1143.

¶46    As to the second ground, *Helena Parents Commission's* conclusion that the plaintiffs had standing is akin to the case at hand. The Court stated "plaintiffs alleged that the government will impose tax burdens on them as it seeks to recoup losses and that the investments will result in a lessening of governmental services. These allegations of an economic injury satisfy the injury requirements." *Helena Parents Comm'n*, 277 Mont. at

23

372, 922 P.2d at 1143. Here, Taxpayers alleged a similar economic injury. Taxpayers alleged that the mismanagement of public funds by the County will impose additional tax burdens on them or reductions in public services to compensate for any deficits. In my opinion, based on *Helena Parents Commission*, the Taxpayers have alleged an actual threatened injury sufficient to allow them to proceed with their case.

¶47 To justify their reasoning, the majority picks and chooses specific facts from the audits. The majority focuses only on the "Total Government Funds" balance but does not consider any other part of the audits. Opinion, ¶ 37. The majority concludes based on this that the Taxpayers have not met the injury requirement to have standing. Such analysis is misleading. For example, the audits revealed "material weaknesses" and "significant deficiencies" in the County's management of public funds that provide public services. The audits specifically stated, "[f]or fiscal year 2014, the County does not have adequate resources to meet current liabilities causing a deficit fund balance." Additionally, the Taxpayers point to eight serious deficiencies highlighted in the audits that have continued throughout several years in their complaint.

¶48 The majority's conclusions about the validity of the audit should be left to a jury, not a judge. Based on the deficiencies found within the audits, the Taxpayers should be afforded the opportunity to fully explore and develop the alleged mismanagement of public funds. Standing requirements should not be barriers to justice. Thus, in my opinion, based on *Helena Parents Commission* and the deficiencies noted in the audits, the Taxpayers

24

have alleged an injury that is not so speculative that we should reject it outright so as to deny Taxpayers the opportunity to purse their claims.

¶49    For these reasons, I dissent.

/S/ MICHAEL E WHEAT