Argued: December 5, 2018 Submitted: December 11, 2018 Decided: February 28, 2019
For Petitioners: Raphael J.C. Graybill, Chief Legal Counsel, Office of the Governor, Helena, Montana
For Respondent: Timothy C. Fox, Montana Attorney General, Rob Cameron, Melissa Schlichting, Deputy Attorneys General, Helena, Montana
For Amicus Curiae Anaconda Sportsmen's Club: Peter Michael Meloy, Meloy Law Firm, Helena, Montana
For Amicus Curiae Public Land/Water Access Association, Inc.: James H. Goetz, Goetz, Baldwin & Geddes, P.C., Bozeman, Montana Paul S. Burdett, Public Land/Water Access Association, Billings, Montana
Chief Justice Mike McGrath delivered the Opinion of the Court.
***41 ¶1 Petitioners Steve Bullock, in his official capacity as Governor of Montana, and Martha *1190 Williams, in her official capacity as Director of the Department of Fish, Wildlife, and Parks, invoke this Court's original jurisdiction to declare whether Montana law requires FWP to bring conservation easement transactions of more than 100 acres or $ 100,000 in value before the Board of Land Commissioners for final approval.
¶2 We restate the issues as follows:
1. Whether the Governor and FWP Director have standing within prudential limits.
2. Whether "land acquisition" per § 87-1-209(1), MCA, requires FWP to bring conservation easement transactions of more than 100 acres or $ 100,000 in value before the Land Board for final approval.
FACTUAL AND PROCEDURAL BACKGROUND
¶3 The parties do not dispute the facts. The sole dispute between the parties is a matter of law. The Attorney General believes that Montana law requires the Department of Fish, Wildlife and Parks (FWP) to seek final approval from the Board of Land Commissioners (Land Board) for conservation easement transactions pursuant to its Habitat Montana Program (Habitat Montana), while the Governor and FWP Director do not. Because the parties dispute only a question of law, and the Governor and FWP Director petitioned this Court directly for declaratory relief, no factual record directs this Court's inquiry. However, a brief factual and procedural background explains how the issue came before the Court.
¶4 Habitat Montana emerged from legislation passed in 1987. See § 87-1-241, MCA ; Admin. R. M. 12.9.508(2) (1994); Admin. R. M.
***42 12.9.511 (1994); Admin. R. M. 12.9.510 (1994). Through Habitat Montana, FWP uses fees from hunting licenses[1] to purchase conservation easements, enter into lease agreements, and purchase fee title lands to conserve wildlife habitat, maintain traditional agricultural uses of land, and provide increased public access to land across the state of Montana. FWP initially purchased few conservation easements due to their relative novelty as a conservation tool and general landowner skepticism. Over time, interest from the agricultural community grew. As of December 2016, FWP held forty-three Habitat Montana conservation easements covering 240,452 acres across the state. "Habitat Montana," Report to 65th Montana Legislature, Montana Fish, Wildlife, and Parks, January 2017.
¶5 Years of upfront costs and collaboration between private landowners and FWP go into conservation easement transactions. The process begins when private land owners voluntarily reach out and work with FWP regional staff to determine whether a project on their property is viable. The Fish and Wildlife Commission (Commission) assesses the project and provides an initial endorsement. The landowner and FWP then collaborate and negotiate until an agreement is reached, which often requires land appraisals, attorney fees, and surveys. Successful projects return to the Commission for public comment, deliberation, and, pursuant to § 87-1-301(1)(e), MCA, final approval. FWP often, but not always, brought these conservation easement transactions before the Land Board for additional approval. The Land Board generally approved the projects.
¶6 FWP is currently in the process of negotiating and approving thirteen conservation easement transactions across the state, three of which previously received final approval from the Commission and faced deadlines for completion before January 1, 2019. Combined, these three transactions would put 18,614 acres of private land across Montana under conservation easement with FWP.
¶7 On September 18, 2017, the Land Board voted down an amendment to the Keogh Ranch Conservation Easement, and on February 20, 2018, the Land Board indefinitely postponed ***43 consideration of the approximately $ 6.1 million,[2] 5,000-acre Horse Creek Conservation *1191 Easement near Wibaux, Montana. FWP did not resubmit the projects. Instead, Governor Bullock directed FWP to finalize the Horse Creek Conservation Easement without the Land Board's final approval. While § 87-1-209(1), MCA, requires final approval from the Land Board for "land acquisition involving more than 100 acres or $ 100,000 in value," Governor Bullock reasoned that "land acquisition" did not include conservation easement acquisition; Montana law did not obligate FWP to bring its conservation easement transactions before the Land Board.
¶8 On August 1, 2018, Senate President Scott Sales requested an Attorney General opinion as to whether § 87-1-209(1), MCA, required the Land Board's final approval on FWP's conservation easement transactions. On October 15, 2018, Timothy C. Fox, in his official capacity as Attorney General of Montana, issued an Opinion (A.G. Opinion) precluding FWP from finalizing conservation easement transactions of more than 100 acres or $ 100,000 in value without the Land Board's final approval. 57 Op. Att'y Gen., (Oct. 15, 2018).
¶9 While an A.G. opinion binds state agencies, an A.G. opinion does not bind the courts, which have the authority to overrule opinions incorrectly interpreting the law. This Court is not bound by an A.G. Opinion. Section 2-15-501(7), MCA ("the attorney general's opinion is controlling unless overruled by a state district court or the supreme court"); O'Shaughnessy v. Wolfe , 212 Mont. 12, 16, 685 P.2d 361, 363 (1984).
¶10 Governor Bullock and FWP Director Williams petitioned this Court to assume original jurisdiction and determine the A.G. Opinion incorrect as a matter of law. The Anaconda Sportsmen's Club and Public Land and Water Access Association, Inc. submitted amicus briefs in support of the Governor and FWP Director's interpretation of § 87-1-209(1), MCA. This Court established an expedited briefing schedule, heard oral argument from the parties on December 5, 2018, and on December 11, 2018, issued an Order accepting original jurisdiction and overruling the A.G. Opinion.
ORIGINAL JURISDICTION
¶11 This Court may assume original jurisdiction when: (1) urgency or emergency factors exist making litigation in the trial courts and the ***44 normal appeal process inadequate; and (2) when the case involves purely legal questions of statutory or constitutional interpretation which are of state-wide importance. M. R. App. P. 14(4).
¶12 The Governor and FWP Director's petition meets the requirements of M. R. App. P. 14(4). This Court assumes original jurisdiction to determine whether "land acquisition" pursuant to § 87-1-209(1), MCA, includes conservation easement transactions and requires the Land Board's final approval.
¶13 This Court properly invokes original jurisdiction "in a declaratory judgment action where legal questions of an emergency nature are presented and ordinary legal procedures will not afford timely or adequate relief." Grossman v. Dep't of Nat. Res. , 209 Mont. 427, 433, 682 P.2d 1319, 1322 (1984). Such is the situation here. Three conservation easement transactions, including the Horse Creek Conservation Easement, faced completion deadlines before the end of 2018, which has since passed. Prior to this Court's Order overruling the A.G. Opinion, these transactions hung in legal limbo. FWP gave its final approval to the projects. Governor Bullock directed FWP that Montana law did not obligate it to bring the conservation easement transactions before the Land Board, and that the transactions would be complete upon FWP's transfer of the necessary funds. The binding A.G. Opinion then precluded FWP from transferring funds and completing the projects without final approval from the Land Board, which had previously tabled discussion on the Horse Creek Conservation Easement indefinitely. Had this Court not accepted original jurisdiction and overruled the A.G. Opinion on December 11, 2018, district court proceedings likely would have resulted in the expiration of the projects. See Grossman , 209 Mont. at 436, 682 P.2d at 1324.
¶14 Habitat Montana conservation easement transactions require years of collaboration *1192 and financial investment from private land owners and FWP. Additionally, FWP uses its Habitat Montana funding to match federal dollars, and partners with various conservation organizations to financially ensure their viability. A district court opinion is not sufficiently authoritative to provide landowners and investors with a final resolution of the constitutional and substantive issues involved. See Grossman , 209 Mont. at 435-36, 682 P.2d at 1324. This Court assumes original jurisdiction to provide a timely and definitive opinion as to whether "land acquisition" includes conservation easement acquisition, and to ensure that the law, rather than uncertainty, guides landowner and investor decision-making and participation in the program. ***45 ¶15 The parties dispute the meaning of § 87-1-209(1), MCA, which is purely a question of statutory interpretation. Habitat Montana conservation easements, as of 2016, cover 240,452 acres across the state. The three FWP-approved conservation easement transactions would add an additional 18,614 acres. The process by which FWP finalizes these conservation easements is an issue of statewide importance. This Court properly assumed original jurisdiction over the issue presented.
DISCUSSION
Historical Background: The Constitutional Convention of 1972
¶16 While the issues presented concern justiciability and statutory interpretation, full appreciation of this decision requires an understanding of the historical context preceding and enshrined in Montana's 1972 Constitution.
¶17 Montana became a state on November 8, 1889, operating under a constitution (1889 Constitution) hastily drafted with statehood in mind. "One interest above all dominated [the delegates to the 1889 Constitutional Convention's] thinking-the mining industry." Montana Constitutional Convention, The Movements for Statehood and Constitutional Revision in Montana, 1866-1972, January 1979, p. v. At the time, Montana's politics revolved around copper, the railroad, timber, and the likes of Marcus Daly and William A. Clark. Private economic interests determined the language adopted in the 1889 Constitution, and set "the tenor of later contests, including a major battle in the Clark-Daly [f]eud and the cause of the scattering of state institutions." Movements for Statehood, p. v.
¶18 In 1970, Montanans voted for a constitutional convention,[3] and in 1972, one hundred delegates from across the State met in Helena, Montana, and embarked on creating a new constitution. Central to the 1972 Constitutional Convention (1972 Con Con) was a desire to re-organize the executive power, which according to the delegates, "had been whittled to insignificance by creation of more than 160 state agencies with little executive or legislative supervision," and to re-establish "the fundamental concept of checks and balances by separate branches of government." Montana Constitutional Convention, Committee Proposals, February 17, 1972, pp. 449-50 (hereinafter ***46 Convention Committee Proposal). The delegates took on the "1889 Constitution's inherent contradiction-the delegation of executive power to the governor, yet restricting that power due to diffusion in Constitutional boards"-and clarified it. Convention Committee Proposal, p. 448.
¶19 The Constitution adopted by the 1972 Con Con and ratified by the people on June 6, 1972, provides, "[t]he executive power is vested in the governor who shall see that the laws are faithfully executed." Mont. Const. art. VI, § 4 (1). The drafters of this language commented:
[Due to] the people having decisively voted to implement a well-ordered executive department of government in place of the 103 or more boards, bureaus, commissions, etc., it is clear that a strong and responsive chief executive is desired. W[e] have clarified his powers and duties accordingly.
Convention Committee Proposal, p. 442. The drafters further commented:
Previously, the divided powers of boards of elective officials, such as the board of examiners, made a mockery of [the provision *1193 ]: 'The supreme executive power of the state shall be vested in the governor, and shall see that the laws are faithfully executed.' The governor, under reorganization and in this article, has the responsibility and the accountability to the electorate and the legislature. This fundamental principle of delegation of power is an important breakthrough in the continuing effort for effective, responsible, viable and efficient government. The state's chief executive will be chief in fact, not in rhetoric.
Convention Committee Proposal, p. 449.
¶20 The delegates determined that the attorney general would be an independent, elected officer of the executive. The Montana Constitution provides: "The attorney general is the legal officer of the state and shall have the duties and powers provided by law." Mont. Const. art. VI, § 4 (4). The drafters of this language noted, "[A]gain it is hoped this office will not be made a policy maker." Convention Committee Proposal, p. 447.
¶21 The Montana Constitution established the board of land commissioners (Land Board), consisting of the governor, superintendent of public instruction, auditor, secretary of state, and attorney general, with "the authority to direct, control, lease, exchange, and sell school lands and lands which have been or may be granted for the support and benefit of the various state educational institutions, under such regulations and restrictions as may be provided by law." Mont. Const. art. X, § 4.
***47 ¶22 It is with the historical context of the 1972 Con Con in mind that this Court determines whether the issue presented is justiciable and whether "land acquisition" per § 87-1-209(1), MCA, includes conservation easement acquisition.
¶23 1. Whether the Governor and FWP Director have standing within prudential limits.
¶24 This proceeding raises various issues of threshold justiciability, including (a) whether Governor Bullock and FWP Director Williams have standing to petition this Court in their official capacities, and (b) whether the issue presented exceeds prudential standing limitations.
¶25 The parties concur that the merits of Habitat Montana are not at issue. We agree with the Attorney General that the issue before this Court is not whether conservation easements are beneficial; such an issue properly belongs before the Montana Legislature. Rather, the issue before this Court is one of constitutional and statutory interpretation, ultimately within the province of the judiciary. See Larson v. State , 2019 MT 28, ¶ 39, 394 Mont. 167, 434 P.3d 241.
¶26 The 1972 Montana Constitution vested the Legislature with the exclusive authority to enact § 87-1-209(1), MCA, the Governor, as the chief officer of the executive, with the exclusive authority and duty to see that the law is faithfully executed, and the judiciary with the exclusive authority and duty to adjudicate the nature, meaning, and extent of applicable constitutional, statutory, and common law. Mont. Const. arts. III, § 1, VI, § 4(1), VII, § 1.
¶27 "The judicial power of Montana's courts, like the federal courts, is limited to justiciable controversies." Plan Helena, Inc. v. Helena Reg'l Airport Auth. Bd. , 2010 MT 26, ¶ 6, 355 Mont. 142, 226 P.3d 567 (internal citations omitted). "A justiciable controversy is one upon which a court's judgement will effectively operate, as distinguished from a dispute invoking a purely political, administrative, philosophical or academic conclusion." Plan Helena, Inc. , ¶ 8 (citing Clark v. Roosevelt Cnty. , 2007 MT 44, ¶ 11, 336 Mont. 118, 154 P.3d 48 ). "[C]ourts have an independent obligation to determine whether jurisdiction exists and, thus, whether constitutional justiciability requirements ... have been met." Plan Helena, Inc., ¶ 11.
¶28 Standing is a threshold jurisdictional requirement that limits Montana courts to deciding only cases or controversies (case-or-controversy standing) within judicially created prudential limitations (prudential standing). Mitchell v. Glacier Cty. , 2017 MT 258, ¶¶ 6, 9, 389 Mont. 122, 406 P.3d 427 (citing Heffernan v. Missoula City Council , 2011 MT 91, ¶ 29, 360 Mont. 207, 255 P.3d 80 ). Standing thus ***48 embodies "two complimentary but somewhat different limitations." Plan Helena, Inc., ¶ 7. Case-or-controversy standing limits the courts to deciding actual, redressable controversy, while prudential *1194 standing confines the courts to a role consistent with the separation of powers. Plan Helena, Inc. , ¶ 7.
¶29 Initially, the Attorney General argues that Governor Bullock and FWP Director Williams lack standing to sue in their official capacities because the Governor and FWP Director did not suffer concrete or personalized injuries.
¶30 Case-or-controversy standing derives from Article VII, Section 4(1), of the Montana Constitution, and Article III, Section 2, of the United States Constitution. Article VII, Section 4(1), of the Montana Constitution, limits Montana courts to deciding "cases at law and in equity," while Article III, Section 2, of the United States Constitution, limit courts to deciding only "cases or controversies." This Court has said that federal precedent interpreting Article III, Section 2, of the United States Constitution, is persuasive authority for interpreting the justiciability requirements of Article VII, Section 4(1), of the Montana Constitution. Heffernan , ¶ 30 n.3 ; Plan Helena , Inc. , ¶ 6.
¶31 When case-or-controversy standing is at issue, the question is whether the complaining party is the proper party before the court, not whether the issue itself is justiciable. Gryczan v. State , 283 Mont. 433, 442, 942 P.2d 112, 118 (1997). To have case-or-controversy standing, "the complaining party must clearly allege past, present, or threatened injury to a property or civil right." Mont. Immigrant Justice All. v. Bullock , 2016 MT 104, ¶ 19, 383 Mont. 318, 371 P.3d 430 (citing Chipman v. Northwest Healthcare Corp. , 2012 MT 242, ¶ 26, 366 Mont. 450, 288 P.3d 193 ). The alleged injury must be: concrete, meaning actual or imminent, and not abstract, conjectural, or hypothetical; redressable; and distinguishable from injury to the public generally. Mont. Immigrant Justice All., ¶ 19 ; Grossman , 209 Mont. at 437, 682 P.2d at 1324 ; Mitchell , ¶ 10 ; Gryczan , 283 Mont. at 442, 942 P.2d at 118 ; Heffernan , ¶ 32. Case-or-controversy standing imposed by the United States and Montana Constitutions must always be met. Heffernan , ¶ 34.
¶32 The determination of a party's standing to maintain an action is a question of law subject to contest at any time by a party or sua sponte. Mitchell , ¶ 6 ; Heffernan , ¶ 29 ; Grossman , 209 Mont. at 437, 682 P.2d at 1324.
¶33 Significantly, the Montana Constitution provides: "The executive power is vested in the governor who shall see that the laws ***49 are faithfully executed." Mont. Const. art. VI, § 4 (1). A principle objective of the 1972 Con Con was to produce a constitution vesting the executive power in the governor "in fact, not in rhetoric." Convention Committee Proposal, p. 449. To this end, the drafters of the 1972 Constitution were unequivocal. And this Court has held that the "Executive branch is ultimately the responsibility of the Governor," whose constitutional duty is "to see that the laws passed by the Legislature are properly executed" with history in mind. MEA-MFT v. McCulloch , 2012 MT 211, ¶¶ 28-29, 366 Mont. 266, 291 P.3d 1075.
¶34 Moreover, following the approval of the Montana Constitution in 1972, the Legislature passed the Executive Reorganization Act, § 2-15-101, et seq., MCA. In 1995, this Court held:
the [c]onstitutional status of the governor as the State's chief executive officer and, subject only to the Constitution and other State laws, require the governor to formulate and administer the policies of the executive branch with 'full powers of supervision, approval, direction, and appointment over all departments and their units.'
State Pub. Employee's Ass'n v. Office of the Governor , 271 Mont. 450, 898 P.2d 675, 679 (1995) (quoting § 2-15-103, MCA ). As Director of FWP, a department of the executive, Williams oversees the administration of Habitat Montana.
¶35 The Governor and FWP Director allege personal concrete injury sufficient to support standing because the A.G. Opinion precluded them from effectuating the constitutional and statutory duties of their respective offices. They contend only the Governor and FWP Director have the authority and ability to sign the papers closing the real estate transaction that creates a conservation easement pursuant to Habitat Montana. We agree. Their injuries are personal, concrete, and redressable.
¶36 Governor Bullock directed FWP to finalize the Horse Creek Conservation Easement *1195 without the Land Board's final approval in furtherance of his constitutional and executive duties as Governor. The A.G. Opinion then precluded FWP Director Williams from following the Governor's direction. Governor Bullock and FWP Director Williams petitioned this Court in their official capacities to interpret the statutory meaning of § 87-1-209(1), MCA. The judiciary has the constitutional authority to interpret the law, overturn the A.G. Opinion, and provide the Governor and FWP Director with the relief they seek-statutory clarity so they may effectuate the duties of their offices. See Larson , ¶ 39, ***50 O'Shaughnessy , 212 Mont. at 16, 685 P.2d at 363 ; § 2-15-501(7), MCA ; Missoula City-County Air Pollution Control Bd. v. Bd. of Envtl. Rev. , 282 Mont. 255, 262, 937 P.2d 463, 467 (1997).
¶37 The Attorney General cites the Supreme Court's holding in Raines v. Byrd, 521 U.S. 811, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997), asserting public officials lack standing to sue where the alleged injury is based on the loss of political power, rather than the loss of any private right. This reading of Raines is misplaced.
¶38 In Raines , six members of Congress challenged the constitutionality of an act authorizing the President to line-item veto spending provisions enacted by Congress in their official capacities. Raines , 521 U.S. at 814-16, 117 S.Ct. at 2315-16. They argued they were personally injured because the President's ability to veto spending provisions changed the institutional effectiveness of their votes. The Supreme Court held that the six members of Congress lacked a personal stake in the outcome because the act damaged the entire Congress equally, and the injury alleged was "wholly abstract and widely dispersed." Raines , 521 U.S. at 821, 829, 117 S.Ct. at 2318, 2322. The Court contrasted the abstract institutional injury alleged in Raines ("dilution of institutional legislative power") with the concrete personal injury ("vote nullification") alleged in Coleman v. Miller , 307 U.S. 433, 438, 59 S.Ct. 972, 975, 83 L.Ed. 1385 (1939). Raines , 521 U.S. at 826, 117 S.Ct. at 2320-21. In Coleman , Kansas's Lieutenant Governor cast the deciding vote to ratify a deadlocked amendment to the U.S. Constitution. The Supreme Court held that state legislators voting against ratification suffered a concrete personal injury sufficient to establish standing because their individual votes were effectively nullified by the Lieutenant Governor's action. Coleman , 307 U.S. at 446, 59 S.Ct. at 979.
¶39 The injury alleged in this proceeding, that the A.G. Opinion blocks the Governor and FWP Director from effectuating the duties of their respective offices, is a concrete injury in line with Coleman , whereas the injury alleged in Raines was the abstract diminution of legislative power. The petitioners do not claim the A.G. Opinion reduces political power across the entire executive, but that the A.G. Opinion personally prevents them from carrying out their constitutional and statutory duties.
¶40 The Attorney General further argues that Raines forecloses standing for public officials filing claims in their official capacities because the alleged injury cannot be personal per se. Again, this reading of Raines is misplaced. The Supreme Court in Coleman held that members of Congress had standing to sue in their official ***51 capacities, which the Court in Raines did not overturn. Coleman , 307 U.S. at 438, 59 S.Ct. at 975 ; Raines , 521 U.S. at 823, 117 S.Ct. at 860-61. Moreover, this Court has held that a local air quality control board's "interest in the effective discharge of the obligations imposed upon it by law [wa]s the equivalent of the personal stake which would support standing of a private citizen." See Missoula City-County Air Pollution Control Bd. , 282 Mont. at 262, 937 P.2d at 467. Governor Bullock and FWP Director Williams are not foreclosed from petitioning this Court solely because they did so in their official capacities.[4] *1196 ¶41 The Governor and FWP Director do not petition this Court on behalf of a vague and general state interest, but in their official capacities as Governor and FWP Director, such that the judiciary has the power to overturn the A.G. Opinion and enable them to effectuate the duties of their official positions consistent with the provisions of Article VII, Section 4(1), of the Montana Constitution. We hold that Governor Bullock's "interest in the effective discharge of [his constitutional and legal obligations as Governor] is the equivalent of the personal stake which would support standing of a private citizen." See Missoula City-County Air Pollution Control Bd. , 282 Mont. at 262, 937 P.2d at 467. FWP Director Williams's interest in the effective discharge of her constitutional and legal obligations as FWP Director similarly supports her standing to petition this Court.
¶42 Secondly, the Attorney General argues that the issue presented exceeds prudential standing limitations; whether Montana law requires FWP to bring its Habitat Montana conservation easement projects before the Land Board is an issue of public policy committed to the Legislature. However, the issue presented is not a question of public policy, but a question of constitutional and statutory interpretation.
¶43 Prudential standing is a form of "judicial self-governance" that discretionarily limits the exercise of judicial authority consistent ***52 with the separation of powers. Heffernan , ¶ 32. The Montana Constitution states, "No person or persons charged with the exercise of power properly belonging to one branch shall exercise any power properly belonging to either of the others, except as in this constitution expressly directed or permitted." Mont. Const. art. III, § 1. Prudential standing embodies the notion that "courts generally should not adjudicate matters 'more appropriately' in the domain of the legislative or executive branches or the reserved political power of the people." Larson , ¶ 16 n.6 (citing Heffernan , ¶ 32 ).
¶44 "[W]here there is a textually demonstrable constitutional commitment of the issue to a coordinate political department[,] or a lack of judicially discoverable and manageable standards for resolving" the issue, the issue is not properly before the judiciary. Nixon v. United States , 506 U.S. 224, 228, 113 S.Ct. 732, 735, 122 L.Ed.2d 1 (1993). Neither exist here. Furthermore, "not every matter touching on politics is a political question." Japan Whaling Ass'n v. Am. Cetacean Soc'y. , 478 U.S. 221, 229, 106 S.Ct. 2860, 2865, 92 L.Ed.2d 166 (1986). "Only those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to other branches of government" are generally excluded. Larson , ¶ 39 (citing Japan Whaling Ass'n , 478 U.S. at 230, 106 S.Ct. at 2866 ) (internal quotations omitted).
¶45 While prudential standing in Montana is not defined by "hard and fast rules," this Court has recognized prudential policy limitations, including that a party may generally assert only his or her own constitutional rights and immunities and that the alleged injury must be distinguishable from the injury to the public in general. Heffernan , ¶ 33. Weighing against these prudential policy limitations is "the importance of the question to the public." Heffernan , ¶ 33 (citing Missoula City-County Air Pollution Control Bd. , 282 Mont. at 260, 937 P.2d at 466 ). Furthermore, this Court has recognized prudential standing where "the statute at issue would effectively be immunized from review if the plaintiff were denied standing." Heffernan , ¶ 33 (citing Gryczan , 283 Mont. at 446, 942 P.2d at 120 ).
¶46 Governor Bullock and FWP Director Williams assert injuries specific to their individual abilities to perform the duties of their positions, which are distinguishable from any general injury to the public. See Heffernan , ¶ 33. Moreover, the process through which FWP finalizes its Habitat Montana conservation easement transactions is an issue of statewide public importance. The issue presented here is not a question of policy or other political consideration. The issue ***53 presented is a basic question of constitutional and statutory interpretation well-suited to the province of the judiciary. This Court has *1197 clear constitutional authority to interpret the statutory language at issue. Disputes within the executive interpreting the effect of the statutory language do not mitigate this Court's authority. See O'Shaughnessy , 212 Mont. at 17, 685 P.2d at 364.
¶47 Finally, the Attorney General cites State ex rel. Olsen v. Pub. Serv. Comm'n , 129 Mont. 106, 115, 283 P.2d 594, 599 (1955), arguing that it is the attorney general's exclusive prerogative "to control and manage all litigation on behalf of the state." However, the 1972 Constitution controls, stating "the attorney general is the legal officer of the state and shall have the duties and powers provided by law." Mont. Const. art. VI, § 4 (4). The delegates to the 1972 Con Con noted the potential for conflict within the executive branch, and stated: "it is hoped [the Attorney General's] office will not be made a policy maker." Convention Committee Proposal, p. 447.
¶48 Rather than usurp the Attorney General's constitutional authority, dismissal of this action for lack of standing would usurp the Governor's constitutional and statutory authority, and thus, Director Williams's statutory authority, effectively immunizing the A.G. Opinion from review. See Heffernan , ¶ 33 (citing Gryczan , 283 Mont. at 446, 942 P.2d at 120 ).
¶49 Case-or-controversy standing and prudential standing are satisfied. The Governor and FWP Director were explicitly prevented from exercising the powers and duties of their official positions authorized by the Constitution and Montana law. It is well within the judiciary's constitutional authority to consider the issue presented. Accordingly, we hold that a justiciable controversy exists and Governor Bullock and FWP Director Williams have standing within prudential limits to petition this Court to determine whether "land acquisition" per § 87-1-209(1), MCA, includes conservation easement acquisition and requires final approval before the Land Board.
¶50 2. Whether "land acquisition" per § 87-1-209(1), MCA, requires FWP to bring conservation easement transactions of more than 100 acres or $ 100,000 in value before the Land Board for final approval.
¶51 The statute at issue provides:
Subject to 87-1-218 and subsection (8) of this section, the department, with the consent of the commission or the board and, in the case of land acquisition involving more than 100 acres or $ 100,000 in value, the approval of the board of land commissioners, may acquire by purchase, lease, agreement, gift, or devise and may acquire easements upon lands or waters for the ***54 purposes listed in this subsection.
Section 87-1-209(1), MCA. The A.G. Opinion held: "[ Section 87-1-209(1) ] requires that [FWP] obtain prior approval of the [Land Board] for acquisitions of easements, including conservation easements, if they involve more than 100 acres or $ 100,000 in value." 57 Op. Att'y Gen. at 1.
¶52 "When interpreting a statute, [this Court's] objective is to implement the objectives the legislature sought to achieve." Mont. Vending, Inc. v. Coca-Cola Bottling Co. , 2003 MT 282, ¶ 21, 318 Mont. 1, 78 P.3d 499. "[T]he starting point for interpreting a statute is the language of the statute itself." Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc. , 447 U.S. 102, 109, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). "If the intent of the legislature can be determined from the plain meaning of the words used in the statute, the plain meaning controls, and this Court need go no further nor apply any other means of interpretation." Mont. Vending, Inc. , ¶ 21.
¶53 Where "the legislature has not defined a statutory term, we consider the term to have its plain and ordinary meaning." State v. Alpine Aviation, Inc. , 2016 MT 283, ¶ 11, 385 Mont. 282, 384 P.3d 1035. "To determine the meaning of a statutorily undefined term, [this Court] may consider dictionary definitions, prior case law, and the larger statutory scheme in which the term appears." Giacomelli v. Scottsdale Ins. Co. , 2009 MT 418, ¶ 18, 354 Mont. 15, 221 P.3d 666 (internal citations omitted). This Court gives "effect to all provisions of the statute if possible." Hiland Crude, LLC v. Dep't of Revenue , 2018 MT 159, ¶ 12, 392 Mont. 44, 421 P.3d 275 (citing § 1-2-101, MCA ); Big Sky Colony, Inc. v. Mont. Dep't of Labor & Indus. , 2012 MT 320, ¶ 70, 368 Mont. 66, 291 P.3d 1231.
*1198 ¶54 The Legislature did not define the term "land acquisition." Thus, this Court considers "land acquisition" to have its plain and ordinary meaning-gaining actual possession over land-consistent with the term's usage throughout the Montana Code.[5] The dictionary definition of acquire is "[t]o gain possession of," while the dictionary definition of land is "[a] tract that may be owned, together with everything growing or constructed on it." Acquire , American Heritage Dictionary of the English Language (3rd ed. 1996); Land , American Heritage Dictionary of the English Language , (3rd ed. 1996). While the ***55 A.G. Opinion states that the Legislature meant "land acquisition" to mean "acquiring an interest in land," 57 Op. Att'y Gen. at 6, this Court "must not insert omitted terms into a statute." Montco v. Simonich , 285 Mont. 280, 287, 947 P.2d 1047, 1051 (1997). Nowhere in the Code does the term generically stand for lesser, non-possessory interests in land.
¶55 Instead, the appearance of the term in other parts of the Code supports that "land acquisition" plainly means an actual possessory interest in land. For example, § 87-1-218(1), MCA, requires FWP to notify counties in which FWP "land acquisitions" are located, to assess local property tax values on those acquisitions. FWP then pays a sum equal to the local property taxes on the land it removes from the county tax base. Section 87-1-218(3)(c), MCA. It defies logic that the Legislature intended the language, "all land acquisitions proposed pursuant to § 87-1-209," to include conservation easement acquisitions when conservation easement acquisitions do not impact local property tax. Instead, "land acquisition" here more logically refers to FWP's actual possession of land, which implicates local property tax.
¶56 In contrast to land, an "easement is a non-possessory interest in land-a right which one person has to use the land of another for a specific purpose or a servitude imposed as a burden upon the land." Walker v. Phillips , 2018 MT 237, ¶ 12, 393 Mont. 46, 427 P.3d 92 ; Ray v. Nansel , 2002 MT 191, ¶ 22, 311 Mont. 135, 53 P.3d 870. "Where a public body acquires ... an interest in land less than fee, this acquisition shall be by conservation easement." Section 76-6-201(1), MCA.
¶57 FWP does not acquire land itself through acquisition of conservation easements on private land; FWP acquires an interest in those lands. The private landowner continues to own, pay taxes on, and maintain his or her right to transfer the property. Rather, FWP's conservation easements burden the land, precluding the landowner "from doing that which, if no easement existed, he would be entitled to do." Conway v. Miller , 2010 MT 103, ¶ 17, 356 Mont. 231, 232 P.3d 390. Section 76-6-203, MCA, lists the types of prohibitions a conservation easement may impose. Affirmative servitudes not attached to land, such as the right "of fishing and taking game," can additionally be held or granted by FWP. Section 70-17-102(1), MCA. While acquisition of a conservation easement means FWP acquires interests in private land, affirmatively and negatively burdening the land, FWP does not acquire the land itself. As conservation easement acquisition falls outside the plain meaning of "land acquisition," FWP is not statutorily required to ***56 take its conservation easement transactions before the Land Board.
¶58 The Legislature distinguished types of land acquisition requiring Land Board approval from conservation easement acquisition in § 87-1-209(1), MCA, which states that FWP "may acquire by purchase, lease, agreement, gift, or devise and may acquire easements upon lands or waters for the purposes listed in this subsection." (Emphasis added.) The A.G. Opinion states this additional language indicates the Legislature's intent to describe the scope of land acquisitions requiring Land Board approval. 57 Op. Att'y Gen. at 6. This interpretation is not consistent with the structure of the sentence, the plain and ordinary meaning of "land acquisition," or with the term's use in the larger statutory scheme in which it appears. The sentence is structured such that the word and separates different methods of "land acquisition" (purchase, lease, agreement, gift, or devise) from easement acquisition. Had *1199 the Legislature intended "land acquisition" to be synonymous with acquisition of an interest in land, it would not have structured the sentence to separate the two concepts. This Court concludes that "may acquire by purchase, lease, agreement, gift, or devise" refers to FWP's actual possessory land acquisitions, while "may acquire easements upon lands or waters" refers to FWP's acquisitions of non-possessory interests. Land acquisitions require Land Board approval; acquisitions of interests in land do not.
¶59 Comparing the language of § 87-1-209(1), MCA, with § 87-1-301(e), MCA, further supports this conclusion. It is a settled rule of statutory construction that this Court interprets "related statutes to harmonize and give effect to each. Different language is to be given different construction." Gregg v. Whitefish City Council , 2004 MT 262, ¶ 38, 323 Mont. 109, 99 P.3d 151 (internal citations omitted). Where the Legislature used different language in the same connection in related statutes, it is presumed it intended a different meaning and effect. Zinvest, LLC v. Gunnersfield Enters. , 2017 MT 284, ¶ 26, 389 Mont. 334, 405 P.3d 1270.
¶60 In setting forth the powers of the Commission, § 87-1-301(1)(e), MCA, states, the Commission "shall approve all acquisitions or transfers by [FWP] of interests in land and water." The parties do not dispute that the language "interests in land" includes conservation easements and requires FWP to seek final approval from the Commission. See § 76-6-201(1), MCA. "Because the enacting Legislature did not use identical language in the two provisions, it is proper for us to assume that a different statutory meaning was intended and that [land acquisition] therefore does not include ***57 [conservation acquisition]." See Zinvest, LLC, ¶ 26. The Legislature, in § 87-1-301(1)(e), MCA, cross-referenced § 87-1-209(1), MCA, indicating it was aware of the distinction between "land" and "interests in land."
¶61 Section 87-1-209(4), MCA, further permits the FWP Director to grant or acquire "right-of-way easements for purposes of utilities, roads, drainage facilities, ditches for water conveyance, and pipelines if the full market value of the interest to be acquired is less than $ 20,000." (Emphasis added.) This language, like the language used in § 87-1-301(1)(e), MCA, further supports that these easements, like conservation easements, are interests in land, not land itself, and that the Legislature was aware of the distinction and chose to employ the language "land acquisition" in § 87-1-209(1), MCA, instead of "acquisition of ... interests in land." While the A.G. Opinion states that "land acquisition" and "acquisition of ... interests in land" are synonymous, this Court properly gives meaning to the Legislature's variation of language. See Zinvest, LLC , ¶ 26 ; 57 Op. Att'y Gen. at 7.
¶62 This Court holds that the plain text of § 87-1-209(1), MCA, does not require FWP to bring conservation easement transactions before the Land Board for final approval. The plain meaning of the term "land acquisition" does not include conservation easement acquisition. Because the intent of the Legislature can be determined from the plain meaning of land acquisition, "the plain meaning controls, and this Court need go no further nor apply any other means of interpretation." See Mont. Vending, Inc. , ¶ 21.
CONCLUSION
¶63 This Court assumes original jurisdiction over the issue presented and finds the issue presented justiciable. The Governor and FWP Director have standing within prudential limits to petition this Court. The Court is well within the sphere of its constitutional authority to interpret the statutory meaning of § 87-1-209(1), MCA. The plain and ordinary meaning of "land acquisition" does not encompass conservation easement acquisition, and § 87-1-209(1), MCA, does not require FWP to finalize its conservation easement transactions with the Land Board.
We Concur:
JAMES JEREMIAH SHEA, J.
INGRID GUSTAFSON, J.
DIRK M. SANDEFUR, J.
BETH BAKER, J.
JIM RICE, J.

The 2017 Habitat Montana Report states that nonresident hunting licenses generate 92% of revenue for Habitat Montana projects. Habitat Montana generates an approximate $ 5.3 million per year. "Habitat Montana," Report to 65th Montana Legislature, Montana Fish, Wildlife, and Parks, January 2017.

The State leveraged roughly $ 4.3 million in Habitat Montana funding against federal dollars to purchase the easement.

In addition to ballot initiative R-67, authorizing the Legislature to call the Constitutional Convention, Montanans passed two additional ballot initiatives calling for re-organization and centralization of the executive.

While the Attorney General cites Schweitzer v. Montana Legislative Assembly , 2010 Mont. Dist. LEXIS 300, for the position that Montana jurisprudence follows his interpretation of Coleman and Raines , Schweitzer is in line with our understanding. The District Court did not hold the Governor could never satisfy the personal stake requirements of standing having sued in his official capacity, but that the Governor's alleged injury was speculative and did not support a finding of standing. Furthermore, while standing was not at issue in these proceedings, Montana's Governor has previously sued in an official capacity. See State ex rel. Judge v. Legislative Fin. Comm. , 168 Mont. 470, 543 P.2d 1317 (1975) ; Schwinden v. Burlington N., Inc. , 213 Mont. 382, 691 P.2d 1351 (1984).

See, e.g. , §§ 7-15-4206(19)(b)(i), -4288(1), 16-10-103(4)(a)(xii), (5)(a)(xii), 17-7-203(1)(b), (2)(b), 70-31-101(2), 77-1-218(1), 77-2-364(4), 87-1-218, MCA ; 90-6-103(9)(a), MCA.